## NEW ENGLAND SAVINGS BANK *v.* BEDFORD REALTY CORPORATION ET AL.
### (SC 15828)

Callahan, C. J., and Norcott, Katz, McDonald and Peters, Js.

Argued May 1—officially released September 1, 1998

*David S. Hoopes*, for the appellant (substitute plaintiff Alaska Seaboard Partners Limited Partnership).

*J. Michael Sulzbach*, for the appellee (named defendant).

*Opinion*

PETERS, J. The principal issue in this appeal is whether, pursuant to General Statutes § 52-180,[1] business records are admissible to prove the amount of a

[1] General Statutes § 52-180 provides in relevant part: "Admissibility of business entries and photographic copies. (a) Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter.

"(b) The writing or record shall not be rendered inadmissible by (1) a party's failure to produce as witnesses the person or persons who made the writing or record, or who have personal knowledge of the act, transaction,

debt, if the witness introducing the records lacks personal knowledge of their provenance. We conclude that such records are admissible, and, therefore, we reverse the judgment of the trial court.

This case arises out of a foreclosure action originally commenced by New England Savings Bank (New England) against the original mortgagor, Stelle M. Mahler. In 1986, Mahler executed a note to New England, secured by a mortgage on her home in Madison. Mahler subsequently conveyed the property to Bedford Realty Corporation (Bedford), the defendant in this action.[2] New England filed this foreclosure action in 1992. Subsequently, New England became insolvent, and the Federal Deposit Insurance Corporation (FDIC) became the receiver of its assets. The FDIC assigned New England's interest in the mortgage to Citizens Savings Bank (Citizens), which, in turn, assigned the mortgage interest to GHR D.C., Inc. (GHR). Citizens and GHR were each substituted, in turn, as plaintiffs in this foreclosure action.

After a trial to the court, *Silbert, J.*, a judgment of strict foreclosure was rendered. On appeal, this court reversed that judgment and remanded the case for a new trial. *New England Savings Bank* v. *Bedford Realty Corp.*, 238 Conn. 745, 680 A.2d 301 (1996). GHR then assigned its interest in the mortgage to Alaska Seaboard Partners Limited Partnership (Alaska), the substituted plaintiff in this appeal (plaintiff).

occurrence or event recorded or (2) the party's failure to show that such persons are unavailable as witnesses. Either of such facts and all other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight of the evidence, but not to affect its admissibility. . . ."

[2] Mahler was not a defendant in this action. Any interest claimed by the defendant Antonio Vanacore, doing business as Avon Tobacco and Candy, is not at issue in this appeal. For the purposes of this appeal, we refer to Bedford as the defendant.

On remand, the action was tried to the court, *DiPentima, J.* One of the principal issues at the hearing was the amount of the indebtedness. In order to establish the amount of the debt, the plaintiff submitted three documents through two witnesses.[3]

The plaintiff first called John Smith, the former director of operations of New England, the original mortgagee. Through Smith, the plaintiff sought to introduce: (1) a payoff statement showing the amount of the debt on April 22, 1993 (exhibit 14A);[4] and (2) a copy of a 1991 annual loan statement sent to the borrower (exhibit 12). The trial court admitted these documents as full exhibits, subject to the condition that the plaintiff prove "where [it] got the document[s]" or "where [they] came from physically."

The plaintiff then introduced, through Russell Bartlett, an account officer at Security National Servicing Corporation, an entity that is managing the loan for the plaintiff, a document containing a set of written calculations that Bartlett had prepared from the plaintiff's business records. These calculations demonstrated that, as of the date of trial, the defendant owed $359,008.69 on the loan principal and $159,190.50 in interest. The court admitted the document, except for the negative escrow calculation, as a full exhibit, exhibit 16.

At the end of the plaintiff's case-in-chief, the defendant moved for dismissal pursuant to Practice Book

---

[3] The parties agree that the promissory note has been lost. In *New England Savings Bank* v. *Bedford Realty Corp.*, supra, 238 Conn. 759–60, however, this court determined that, because this is an equitable foreclosure action on the mortgage, not a legal action on the note itself, the plaintiff is free to produce other reliable evidence to prove the amount of the debt. "A bill or note is not a debt; it is only primary evidence of a debt; and where this is lost, impaired or destroyed bona fide, it may be supplied by secondary evidence." (Internal quotation marks omitted.) Id., 760

[4] The FDIC took over New England in May, 1993.

§ 15-8, formerly § 302,[5] on the ground that the plaintiff had not made a prima facie showing regarding the amount of the debt. The trial court granted the defendant's motion. The court reasoned that the plaintiff had failed to qualify its exhibits 12 and 14a as business records under § 52-180, because, Smith, the witness introducing those records, lacked knowledge of how the records had gotten to the courthouse.

The plaintiff moved to open the judgment, and the trial court denied its motion. The plaintiff filed a motion to reargue and for reconsideration, which the trial court also denied. The plaintiff appealed from the judgment to the Appellate Court, and we transferred the case to this court pursuant to General Statutes § 51-199 (c)[6] and Practice Book § 65-1, formerly § 4023.

On appeal to this court, the plaintiff raises three issues. It argues that the trial court improperly: (1) excluded the plaintiff's exhibits 12 and 14a; (2) determined that the plaintiff's exhibit 16 was insufficient to establish a prima facie case regarding the amount of principal and interest presently due on the mortgage debt; and (3) declined to render judgment for the plaintiff based on the principal and interest amounts set out in the plaintiff's exhibit 16. The defendant counters this last claim by arguing that the plaintiff failed to make a prima facie case in other respects. We reverse the trial court's judgment and remand the case for a new trial.

---

[5] Practice Book § 15-8, formerly § 302, provides: "Dismissal in Court Cases for Failure to Make Out a Prima Facie Case

"If, on the trial of any issue of fact in a civil action tried to the court, the plaintiff has produced evidence and rested his or her cause, the defendant may move for judgment of dismissal, and the judicial authority may grant such motion, if in its opinion the plaintiff has failed to make out a prima facie case. The defendant may offer evidence in the event the motion is not granted, without having reserved the right to do so and to the same extent as if the motion had not been made."

[6] General Statutes § 51-199 (c) provides in relevant part: "The Supreme Court may transfer to itself a cause in the Appellate Court. . . ."

## I

We first address the evidentiary issue regarding the standard for admission of business records that was raised by the trial court's exclusion of exhibits 12 and 14a. The plaintiff argues that the trial court improperly excluded these exhibits. We agree.[7]

The trial court concluded that the exhibits were inadmissible because the plaintiff had failed to: (1) establish the required foundation for admission of a business record under § 52-180; and (2) authenticate the documents. In its memorandum of decision, the trial court reasoned that because Smith, the New England director of operations, had no personal knowledge of when these documents had been created, he could not testify that they had been generated in the regular course of business within the meaning of § 52-180. The trial court also concluded: "Smith testified that [e]xhibits 12 and 14a are documents that appear to be those once kept by [New England] in the regular course of its business. Nevertheless, the plaintiff has not established how or whether its counsel came to possess the proffered exhibits from [New England]."

---

[7] Although the Appellate Court has held that, "[t]he trial court has discretion to determine whether the [business records exception] statute is satisfied and appellate courts must construe the statute liberally when reviewing abuse of discretion"; *Berkeley Federal Bank & Trust, FSB* v. *Ogalin*, 48 Conn. App. 205, 208, 708 A.2d 620, cert. denied, 244 Conn. 933, 711 A.2d 726 (1998); plenary review is more appropriate for the question of law raised in this appeal. Justice McDonald's dissent characterizes the issue on appeal as whether the trial court abused its discretion in excluding the proffered documents on the ground that the plaintiff allegedly failed to establish a sufficient chain of custody to authenticate them. In fact, the crux of the issue on appeal is a question of law: whether establishing such a chain of custody is a predicate for admitting documents as business records under § 52-180. Because we review the trial court's interpretation of the statute, and the statute's applicability to the proffered documents, our review is plenary. See Practice Book § 60-5, formerly § 4061; see also *Gateway Co.* v. *DiNoia*, 232 Conn. 223, 229, 654 A.2d 342 (1995) ("[w]hen . . . the trial court draws conclusions of law, our review is plenary").

The trial court's conclusions raise two distinct doctrinal issues. We must determine whether the documents were: (1) admissible under the business records exception to the general prohibition on hearsay; and (2) authenticated sufficiently to demonstrate the minimal indicia of reliability necessary to render them admissible.

A

We consider first whether the plaintiff established a sufficient foundation to render exhibits 12 and 14a admissible under the hearsay exception contained in § 52-180.[8] To assess the applicability of this statute, we need to review briefly its common-law antecedents. The history of the business records exception starts from the recognition that this exception to the general prohibition on hearsay originated at common law and was thereafter incorporated into statute, first in England and later in this country. 5 J. Wigmore, Evidence (4th Ed. 1974) § 1517, pp. 426–39. The initial rationale for the exception was that, although hearsay, business records were trustworthy because their creators had relied on the records for business purposes. Id., § 1522, pp. 442–43.

The need for the exception became more pressing as the American economy became industrialized and produced more complex litigation. In 1927, Judge Learned Hand wrote: "The routine of modern affairs, mercantile, financial and industrial, is conducted with so extreme a division of labor that the transactions cannot be proved at first hand without the concurrence of persons, each of whom can contribute no more than a slight part, and that part not dependent on his memory of the event. Records, and records alone, are their adequate repository, and are in practice accepted as accurate upon the faith of the routine itself, and of the self-consistency of their contents. Unless they can be used

---

[8] See footnote 1 of this opinion for the text of § 52-180.

in court without the task of calling those who at all stages had a part in the transactions recorded, nobody need ever pay a debt, if only his creditor does a large enough business." *Massachusetts Bonding & Ins. Co.* v. *Norwich Pharmacal Co.*, 18 F.2d 934, 937 (2d Cir. 1927).

With these principles in mind, we turn to the requirements for the admission of business records under § 52-180. As a matter of statutory construction, "[t]here is no more elementary rule of statutory construction than that the intention which the legislature has expressed must govern. . . . [L]egislative intent is to be determined by reference to the language of the statute, its legislative history and surrounding circumstances, the policy the limitation was intended to implement, and the statute's relationship to existing legislation and common law principles governing the same general subject matter." (Citations omitted; internal quotation marks omitted.) *Iovieno* v. *Commissioner of Correction*, 242 Conn. 689, 695, 699 A.2d 1003 (1997).

We begin with the language of the statute. On its face, the statute expands the rules for admission of business records. Section 52-180 (b) provides that a record "shall not be rendered inadmissible by (1) a party's failure to produce as witnesses the person or persons who made the writing or record, or who have personal knowledge of the act, transaction, occurrence or event recorded or (2) the party's failure to show that such persons are unavailable as witnesses. Either of such facts and all other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight of the evidence, but not to affect its admissibility."

There is little legislative history, in large part because Connecticut adopted a statutory business records exception long before the advent of comprehensive

published legislative history in 1953. As early as 1715, however, Connecticut enacted a statute making book entries admissible for actions for book debt. Predecessors of the modern § 52-180 were incorporated into the statutory revisions of 1902, 1918, 1930 and 1949.

Early Connecticut case law enunciated rules favoring the admissibility of business records. See generally 2 B. Holden & J. Daly, Connecticut Evidence (1988) § 89, pp. 793–94. In 1818, Chief Judge Zephaniah Swift concluded that a shop book was admissible to prove the amount of indebtedness. *De Forest* v. *Bacon*, 2 Conn. 633, 638 (1818); see *Clark* v. *Savage*, 20 Conn. 258, 260–61 (1850). Such entries were admissible in proceedings involving parties other than the original debtor and creditor. *Bridgewater* v. *Roxbury*, 54 Conn. 213, 218–19, 6 A. 415 (1886). Although a witness was required to identify the books, he or she was not permitted to testify regarding their contents. *Treat* v. *Barber*, 7 Conn. 274, 278 (1828).

More recent Connecticut case law has articulated similarly modest requirements for the admission of business records under § 52-180. See generally C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 11.14.3, pp. 386–87. "The court must determine, before concluding that [the document] is admissible, that the record was made in the regular course of business, that it was the regular course of such business to make such a record, and that it was made at the time of the act described in the report, or within a reasonable time thereafter." (Internal quotation marks omitted.) *Bell Food Services, Inc.* v. *Sherbacow*, 217 Conn. 476, 485, 586 A.2d 1157 (1991). The proponent need not prove the accuracy of the record; its weight is an issue for the trier of fact. *State* v. *Waterman*, 7 Conn. App. 326, 341–42, 509 A.2d 518, cert. denied, 200 Conn. 807, 512 A.2d 231 (1986).

We have stated that § 52-180 "should be liberally interpreted" in favor of admissibility. *Bell Food Services, Inc.* v. *Sherbacow,* supra, 217 Conn. 485; see *Emhart Industries, Inc.* v. *Amalgamated Local Union 376, U.A.W.,* 190 Conn. 371, 388, 461 A.2d 422 (1983). The witness introducing the document need not have made the entry himself or herself, nor have been employed by the organization during the relevant time period. *Baumert-Moran Sales Co.* v. *Red Bird Truck Rental Corp.,* 149 Conn. 42, 45, 175 A.2d 189 (1961). In addition, "[t]here is no requirement in § 52-180 . . . that the documents must be prepared by the organization itself to be admissible as that organization's business records." *Crest Plumbing & Heating Co.* v. *DiLoreto,* 12 Conn. App. 468, 475, 531 A.2d 177 (1987).

In this case, the witness introducing the disputed exhibits had been the director of operations of New England for the seven years preceding the closure of the bank, and had set up the procedures to create and format such documents. He testified that the proffered documents appeared to be records generated by New England in the regular course of its business. He also stated that it was the practice at New England to record charges and interest at or near the time they accrued. We conclude that this testimony sufficed to meet the plaintiff's burden to establish a sufficient foundation to render exhibits 12 and 14a admissible as business records under § 52-180.[9]

B

Having concluded that exhibits 12 and 14a were admissible under § 52-180, we next must determine whether they were properly authenticated. The question is whether a business record may be admitted even

[9] We consider only whether these documents were admissible under § 52-180. We do not decide whether these exhibits should have been excluded on other grounds.

though the qualifying witness lacks personal knowledge of its provenance. We conclude that a proponent need not establish a chain of custody in order to authenticate a business record.

" 'Authentication' is . . . a necessary preliminary to the introduction of most writings in evidence . . . ." 2 C. McCormick, Evidence (4th Ed. 1992) § 218, p. 36. A proponent may authenticate a document by demonstrating "proof of authorship of, or other connection with, [such] writings." Id. In general, a writing may be authenticated by a number of methods, including direct testimony, circumstantial evidence or proof of custody. Id., §§ 219 through 228, pp. 38–58.

The requirements for authenticating a business record are identical to those for laying a foundation for its admissibility under the hearsay exception. "It is generally held that business records may be authenticated by the testimony of one familiar with the books of the concern, such as a custodian or supervisor, who has not made the record or seen it made, that the offered writing is actually part of the records of the business." Id., § 219, p. 39; see *Rosenberg* v. *Collins*, 624 F.2d 659, 665 (5th Cir. 1980) ("[a]ny person in a position to attest to the authenticity of certain records is competent to lay the foundation for the admissibility of the records; he [or she] need not have been the preparer of the record, nor must he personally attest to the accuracy of the information contained in the records"); *Rice* v. *United States*, 411 F.2d 485, 488 (8th Cir. 1969) (declining to require testimony of authenticating witness with personal knowledge of creation of record because Federal Business Records Act " 'was intended to eliminate the technical requirement of proving the authenticity of records and memoranda by the testimony of the maker' ").

Other jurisdictions explicitly have rejected the notion that a proponent must prove a chain of custody in order

to authenticate a business record. The Court of Appeals of New Mexico has held that questions about the accuracy of a document "stemming from a gap in the chain of custody or from possible incorrect entries affect the weight, not the admissibility," of the document. *Central Security & Alarm Co.* v. *Mehler*, 121 N.M. 840, 918 P.2d 1340, 1350 (App. 1996). Likewise, the United States District Court for the Northern District of Indiana has stated that, "[t]he business records exception to the hearsay rule found in Federal Rule of Evidence 803 (6) does not require a showing of chain of custody." *Pieters* v. *B-Right Trucking, Inc.*, 669 F. Sup. 1463, 1465 (N.D. Ind. 1987); see *United States* v. *Bermea*, 30 F.3d 1539, 1574 (5th Cir. 1994), cert. denied sub nom. *Rodriguez* v. *United States*, 513 U.S. 1138, 115 S. Ct. 1113, 130 L. Ed. 2d 1077, cert. denied sub nom. *Garza* v. *United States*, 514 U.S. 1097, 115 S. Ct. 1825, 131 L. Ed. 2d 746 (1995) ("any break in the chain of custody goes to the weight of the evidence rather than its admissibility").

There are persuasive policy reasons for us to adopt such a rule. As the trial court aptly noted in a prior evidentiary ruling below: "[T]his case presents a common difficulty of our present day foreclosure actions. Many banks have gone into receivership and mortgages frequently have been assigned again and again. The original employees handling the loan are not always available or willing to testify." As we have concluded above, the director of operations of New England was qualified to testify that the documents introduced were records produced in the regular course of business at the bank. To require testimony regarding the chain of custody of such documents, from the time of their creation to their introduction at trial, would create a nearly insurmountable hurdle for successor creditors attempting to collect loans originated by failed institutions.

We conclude that exhibits 12 and 14a were admissible as business records and were properly authenticated. Accordingly, we reverse the judgment of the trial court because of its contrary ruling concerning this evidentiary issue.

## II

We next address whether the trial court improperly determined that the plaintiff's exhibit 16 was insufficient to establish a prima facie case regarding the amount of principal and interest presently due on the mortgage debt. We must determine whether: (1) exhibit 16 was admissible as a business record; and (2) the plaintiff introduced sufficient evidence to constitute prima facie evidence of the amount of indebtedness.

## A

The threshold question is whether exhibit 16 was admissible. Exhibit 16 consisted of a calculation of the amount of indebtedness at the time of trial, including interest, late charges and negative escrow.[10] Bartlett, the account manager acting on behalf of the plaintiff, testified that he had made these calculations using the principal balance from exhibit 14a[11] as his starting point. The trial court admitted exhibit 16, except for the negative escrow calculation,[12] as a full exhibit.

---

[10] The defendant argues that exhibit 16, at best, established the amount of principal due on September 1, 1991, and the interest and late charges that would have accrued if there had been no further payments. We disagree. Payment is an affirmative defense that must be proved by the defendant. See *Apuzzo* v. *Hoer*, 125 Conn. 196, 203, 4 A.2d 424 (1939); *Morehouse* v. *Throckmorton*, 72 Conn. 449, 452, 44 A. 747 (1899).

[11] Because the plaintiff characterizes exhibit 12 as "merely cumulative and supportive of the facts to be proved by [e]xhibit 14[a]," we focus on exhibit 14a as the foundation for exhibit 16.

[12] The plaintiff does not challenge the court's exclusion of the negative escrow amount from the redacted exhibit 16. The issue on appeal, therefore, is whether exhibit 16, as the trial court initially held, was admissible.

In its motion to reargue and for reconsideration, the plaintiff claimed that the amount of principal and interest due on the debt was established by exhibit 16, even without exhibits 12 and 14a. The trial court concluded in its ruling on the motion that it had admitted exhibit 16 upon the conditional admission of exhibit 14a. Because it had subsequently excluded exhibit 14a, the court reasoned, exhibit 16 was rendered inadmissible.

The problem of proving a debt that has been assigned several times is of great importance to mortgage lenders and financial institutions. At trial, Bartlett testified that failed institutions often sell notes and mortgages in bulk, and that investors in the secondary market acquire these assets and begin a collection process. Such investors typically receive the note and mortgage, as well as a file from the failed institution indicating the current account balance. These records become the basis for monitoring further account activity.

If we had not decided in part I of this opinion that exhibit 14a was admissible, we would be required to determine whether a record created by a subsequent holder of a note, based on an initial figure from a failed bank's account books not in evidence, could be admitted as a business record of the second entity. In this appeal, our task is simplified, however, because the plaintiff introduced not only the calculations prepared by the witness on the basis of New England records (exhibit 16), but also the New England records containing the starting figure (exhibits 12 and 14a).[13] We

[13] It is useful to note that exhibit 16 does not present the best evidence issues that we confronted in *New England Savings Bank* v. *Bedford Realty Corp.*, supra, 238 Conn. 745. In that case, we concluded that the plaintiff could not establish the amount of the debt solely through the testimony of a witness whose knowledge of the account was based on reading a file compiled by a previous holder. Id., 757–58. We noted that the plaintiff had not offered into evidence as business records any of the documents on which the witness had relied. Id., 758. We concluded, therefore, that the witness' testimony, without more, was insufficient to establish the amount

conclude that, consistent with the logic of the trial court's memorandum of decision, linking the question of its admissibility to the admissibility of exhibit 14a, exhibit 16 was admissible.

## B

We next consider whether exhibit 16, viewed in conjunction with exhibit 14a, constituted prima facie evidence of the amount of indebtedness. We conclude that the plaintiff submitted sufficient evidence to constitute a prima facie case concerning the amount of the debt.

A prima facie case, in the sense in which that term is relevant to this case, is one sufficient to raise an issue to go to the trier of fact. 9 J. Wigmore, supra, § 2494, p. 379. In order to establish a prima facie case, the proponent must submit "evidence which, *if credited*, is sufficient to establish the fact or facts which it is adduced to prove." (Emphasis in original; internal quotation marks omitted.) *Berchtold* v. *Maggi*, 191 Conn. 266, 270, 464 A.2d 1 (1983); see C. Tait & J. LaPlante, supra, § 4.3, p. 72. In evaluating a motion to dismiss, "[t]he evidence offered by the plaintiff is to be taken as true and interpreted in the light most favorable to [the plaintiff], and every reasonable inference is to be drawn in [the plaintiff's] favor." (Internal quotation marks omitted.) *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, 187 Conn. 544, 548, 447 A.2d 406 (1982).

---

of the debt. Id. In order to prove the amount of the debt, the plaintiff was required to submit the actual business records, rather than mere oral testimony regarding their contents. See *National Broadcasting Co.* v. *Rose*, 153 Conn. 219, 227, 215 A.2d 123 (1965) ("[t]he proper way to prove the contents of such records is to introduce the record itself rather than to receive oral testimony as to the contents of the records"). In this case, the plaintiff introduced not only the witness' oral testimony regarding his calculation of the debt, but also a document demonstrating that calculation (exhibit 16), and the record containing the starting figure for his calculation (exhibit 14a).

In this case, exhibits 14a and 16, viewed together, presented evidence that, if credited, was sufficient to establish the amount of indebtedness at the time of trial and to meet the plaintiff's initial burden of proof. Accordingly, we reverse the trial court's ruling with respect to this issue.

## III

We consider, finally, whether the trial court improperly declined to render judgment for the plaintiff. We remand the case for a new trial. In order to provide guidance to the trial court, however, we address the defendant's claim regarding the sufficiency of the plaintiff's prima facie case with respect to the issue of notice.

## A

In its memorandum of decision, the trial court concluded that the plaintiff had failed to present a prima facie case regarding default and the amount of the debt. Although the trial court mentioned the existence of other issues, such as valuation, it did not make further factual findings.

The plaintiff now claims that the trial court improperly declined to render judgment regarding the amount of the debt. Although we have determined that the plaintiff carried its burden of making a prima facie case regarding the amount of the debt, the trial court still must determine whether, with respect to all of the elements of the plaintiff's prima facie case, the plaintiff carried its ultimate burden of persuasion. It is not our role as an appellate court to make factual findings to determine whether the plaintiff has carried this burden. See C. Tait & J. LaPlante, supra, § 3.1., p. 36. Moreover, the trial court still must make numerous other factual determinations, including, but not limited to, a finding of valuation. Accordingly, we remand this case for a new trial on these remaining issues.

## B

In order to provide guidance to the trial court on remand, however, we address briefly the defendant's claim that, even if the plaintiff proved the amount of the debt outstanding, it failed to present a sufficient prima facie case because it failed to introduce any evidence of notice of acceleration. The defendant argues that, pursuant to the terms of the acceleration clause of the mortgage instrument, such notice was a condition precedent to foreclosure and, therefore, a necessary element of the plaintiff's prima facie case.[14]

The plaintiff disagrees. It counters that: (1) notice of acceleration was not an absolute condition precedent to seeking the remedy of foreclosure; and (2) it gave sufficient notice of acceleration in its motion for relief from automatic stay filed in the United States Bankruptcy Court.

"[A] foreclosure complaint must contain certain allegations regarding the nature of the interest being foreclosed. These should include allegations relating to the parties and terms of the operative instruments, the nature of the default giving rise to the right to foreclosure, the amount currently due and owing, the name of the record owner and of the party in possession, and appropriate prayers for relief." D. Caron, Connecticut Foreclosures: An Attorney's Manual of Practice and Procedure (3d Ed. 1997) § 4.09, p. 106.[15]

---

[14] Although the defendant filed no statement of alternate grounds for affirmance of the trial court's dismissal pursuant to Practice Book § 63-4, formerly § 4013, its argument responds to the plaintiff's claim that the trial court improperly declined to render judgment for the plaintiff. Accordingly, we will review the defendant's claim.

[15] In addition, although not directly relevant to this case, Practice Book § 10-69, formerly § 186, requires that, in addition to its essentials, a foreclosure complaint must plead "[a]ll encumbrances of record upon the property both prior and subsequent to the encumbrance sought to be foreclosed, the dates of such encumbrances, the amount of each and the date when such encumbrance was recorded; if such encumbrance be a mechanic's lien, the

The terms of the mortgage determine the necessary elements of the plaintiff's prima facie case. The adjustable rate rider provides in relevant part: "B. Transfer of the Property or a Beneficial Interest in Borrower. Uniform Covenant 17 of the Security Instrument is amended to read as follows If all or any part of the Property or any interest in it *is sold or transferred . . . without Lender's prior written consent,* Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument . . . ." (Emphasis added.) Covenant 17 further provides: "If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower."

In order to determine the notice required by covenant 17, it is instructive to read its language jointly with other provisions in the mortgage. It is especially illuminating to compare the language of covenant 17 with that of covenant 19,[16] which by its terms does not apply to unauthorized transfer cases.

---

date of commencing to perform services or furnish materials as therein recited; and if such encumbrance be a judgment lien, whether said judgment lien contains a reference to the previous attachment of the same premises in the same action, as provided by General Statutes § 52-380a."

[16] Covenant 19 provides: "Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraphs 13 and 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in

Covenant 17 provides that, upon unauthorized transfer, the bank may accelerate immediately, provided that the borrower has thirty days, after acceleration, to pay the debt before facing mortgagee remedies such as foreclosure. Covenant 17 provides that the bank may "require *immediate payment* in full"; (emphasis added); if the property is sold or transferred without the bank's approval. It provides that the lender must give the borrower "notice of acceleration," which shall provide "*a period of not less than 30 days* from the date the notice is delivered or mailed"; (emphasis added); in which the borrower may pay. If the borrower fails to pay all sums due within those thirty days, the "[l]ender may invoke any *remedies* permitted by this Security Instrument." (Emphasis added.)

By contrast, covenant 19 provides that a detailed notice must be sent *before* acceleration, setting a specific date thirty days later, by which a borrower must pay in order to avoid acceleration. Covenant 19 provides that, in the event that a borrower breaches a covenant of the security instrument other than covenants 13 and 17, the lender shall give notice to the borrower "*prior to acceleration . . . .*" (Emphasis added.) This notice must specify the default, the action required to remedy the default and *a date*, not less than thirty days from the date the notice is given to the borrower. It also must state that "failure to cure the default on or before

acceleration of the sums secured by this Security Instrument and foreclosure or sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in court the non-existence of a default or any other defense of Borrower to acceleration and foreclosure or sale. If the default is not cured on or before the date specified in the notice, Lender at Its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke any of the remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 19, including, but not limited to, reasonable attorneys' fees and costs of title evidence."

*the date* specified in the notice *may result in accelera-
tion . . . .*" (Emphasis added.)

At trial, in light of covenant 17, the plaintiff stated
that exhibits 7 and 8 formed the basis for its prima facie
case with respect to the notice of acceleration. Exhibit
7 was the plaintiff's motion for relief from automatic
stay, filed in the United States Bankruptcy Court,
requesting permission to foreclose on the property.
Exhibit 8 was the transcript of the proceedings on that
motion in the Bankruptcy Court.

The plaintiff's motion for relief from automatic stay
alleged: "The debtor has failed to pay the installments
required pursuant to the terms of the Note and the
Mortgage to be paid on October 1, 1991, and each and
every month thereafter and is in default pursuant to
the terms of the Note and the Mortgage. . . . On Octo-
ber 10, 1990, the debtor conveyed the Mortgaged Prop-
erty to [Bedford] without the consent of the Bank.
Consequently, the Bank has elected to require payment
in full of all sums owing pursuant to the terms of the
Note and the Mortgage and the Bank hereby gives the
Debtor notice of acceleration of this indebtedness." In
other words, the plaintiff proceeded on the theory of
acceleration provided in covenant 17 in the event of an
unauthorized transfer.

In light of the applicable notice requirements of cove-
nant 17, we conclude that the plaintiff's motion for relief
from automatic stay was sufficient notice of accelera-
tion, provided that it was mailed or delivered at least
thirty days before a judgment of foreclosure entered.
The plaintiff filed its motion for relief from automatic
stay on or about April 20, 1992. A judgment of strict
foreclosure was rendered by the court, *Silbert, J.,* on
January 20, 1995, after the first trial in this case. There-
fore, the plaintiff gave notice of acceleration in compli-
ance with the thirty day period required by covenant 17.

The judgment is reversed and the case is remanded for a new trial.

In this opinion CALLAHAN, C. J., and NORCOTT and KATZ, Js., concurred.

MCDONALD, J., dissenting. The majority concludes that the trial court improperly excluded two documents. One document purported to be a copy of the New England Savings Bank's 1991 year-end statement to a mortgagor and the other purported to be a payoff statement addressed to that now defunct bank's collection department and dated April 22, 1993.

A witness, John Smith, testified that the documents appeared to be those once produced by the bank. However, another witness, Sandra Reid, who supervised the bank's collection department in 1993, testified that she could not recall ever seeing the payoff statement. Reid had prepared an affidavit of debt and testified on behalf of the bank in this case in May, 1993, and November, 1996.

The plaintiff's counsel, Charles Houlihan, who possessed the documents, testified that the payoff statement had been given to him before the trial by Stephen Burns, an agent of the bank's successor, Alaska Seaboard Partners Limited Partnership.

The trial judge had repeatedly advised counsel that she required evidence of the source of the documents. Burns, nevertheless, was not produced, being in St. Louis on other business. Burns' assistant, Russell Bartlett, was called to testify, and did not offer any information about their source. The trial judge, who had heard this case from November, 1996, until May, 1997, through continued hearings, stated that the absence of Burns made her decision more difficult. The trial judge subsequently refused to admit the documents.

The majority states that the records are authenticated where there is testimony that "the offered writing is actually part of the records of the business." I agree with this quotation from Professor McCormick. There is, or should be, a large difference between what appears to be and what actually is a business record. In this case, the original note was lost, the witness who supervised the collection department and testified in 1993 did not authenticate the documents and the history of the documents was a mystery. In these circumstances, I believe that the trial judge was correct to require the proponent to show what appears to be records to be the actual records by tracing them, in some manner, back to the bank. The trial court's subsequent rulings based on the rejection of the documents were therefore correct. I would affirm the trial court.[1]

Accordingly, I respectfully dissent.

---

[1] The majority does not employ the "clear abuse of discretion" standard to uphold the trial court as was done in *Claveloux* v. *Downtown Racquet Club Associates*, 246 Conn. 626, 634, 717 A.2d 1205 (1998). I do not suggest that this standard is proper. See id., 635 (*McDonald, J.*, dissenting).