MEMORANDUM OF DECISION
CT Page 4788
On August 2, 1999, the Department of Children and Families, hereafter "DCF", filed petitions for the termination of the parental rights of Lucille D. and Bruce C. to their daughter, Brittany C. The trial on the termination petition against the parents was held over four days, on March 6, March 7, March 9 and March 10, 2000. On March 9, 2000, Bruce C. consented to the termination of his parental rights. The court found his consent to be knowingly and voluntarily made and accepted his consent. The petition was amended to reflect that consent. At the close of DCF's case in chief, the respondent mother moved to dismiss the case, claiming that DCF had failed to make out a prima facie case. For the reasons stated below, the court denies the motion and grants the petition for termination of the parental rights of Lucille D. because of her failure to rehabilitate herself as a parent of this child.
From the evidence presented, the court finds the following facts:
 A. FACTS 1. Lucille D., the mother.
Lucille D. is now thirty-nine years old, and by all accounts had a comfortable childhood. She graduated from high school and began to be employed. She has worked through the years primarily as a waitress. She was married to Mr. D., the father of her oldest child, Anthony, for a number of years, before their divorce in the early 1990s. Lucille, it would appear, would not otherwise be involved with DCF or this court except for her persistent substance abuse. By her own admissions to various substance abuse facilities, she began to use heroin and cocaine by 1985, when she was twenty-four, and has been unable to stop her regular use of both substances since, except for brief periods of up to six months. The testimony revealed that she had admitted to using CT Page 4789 crack cocaine and heroin as recently as the last weeks of February, 2000.
DCF become involved with Lucille D. on July 17, 1996, when Lucille was arrested at a grocery store for shoplifting and risk of injury to a child at around nine o'clock at night. Brittany and Anthony were with her. Brittany was then just over a year old and Anthony was six. On that evening, Lucille had a cart full of groceries, which she attempted to wheel out of the store without paying, when she was stopped by the grocery store personal. As the police would later note, she had no money with her and must have been planning to steal the groceries while her children were with her. Bruce C., Brittany's father, was also involved and was in the parking lot coming to pick her up[2]. Both Brittany and Anthony were placed with Anthony's father, Mr. D., while DCF sought and secured an order of temporary custody for Brittany after Lucille was arrested and jailed overnight. That order was secured on July 22, 1996, as not only had Lucille exposed the children to these incidents, but was also then identified as a heroin user.
By September, 1996, when there were some difficulties in licensing Anthony's father's home for Brittany's continued care, Brittany came to live with her present foster family. On January 6, 1997, Brittany was adjudicated a neglected child and committed to the care and custody of DCF. Her commitment has been extended several times since that date. Brittany has been fortunate in her foster home placement and the family wishes to adopt her, should she become available for adoption.
The next months and years after Brittany's removal were characterized by Lucille's fitful and at times marginal attendance at various drug treatment programs, from which she was often discharged for non-compliance with the rules of those programs. Her life since 1996, the clear and convincing evidence revealed, is typical of the life of those individuals in our society who have long term addiction problems. She and her service providers consistently underestimated the difficulty she would have in remaining abstinent. There were inadequate plans for the inevitable relapse as well as hiding drug usage from those who could help. Lucille also repeatedly failed to attend AA or NA programs and to secure a sponsor to support her in her struggle to remain drug-free.
Following her arrest in the summer of 1996, Lucille attempted to enter the Blue Hills substance abuse treatment facility. CT Page 4790 Ultimately, she spent three months in jail, from September 29, 1996 to December 12, 1996 as she had a previous arrest record.[3]
Upon her release as part of her probation, she was required to attend a substance abuse program. She was admitted to Fresh Start, a program where she would have been able to have Brittany stay with her after the first three or four months.[4] However, on March 11, 1997, Lucille left this program and did not return. She admitted she had relapsed. To her credit, she shortly thereafter enrolled herself in the Stonington Institute and received in-patient treatment there for some time. On June 16, 1997, she completed the program and her counselor reported to DCF that she was doing well.[5]
As would happen more times in the future, however, Lucille's return to the community also returned her to the situations and temptations with which she had had difficulty before. By August 14, 1997, she reported that she had been drinking and was out of work. By October 6, 1997, she admitted she was using heroin and admitted herself to another treatment program, Coventry House. This was a program for high-risk pregnant substance abusers and when Lucille lost the baby she was carrying in January, 1998, she went to another program, Clayton House. Shortly before her discharge from this program, Lucille signed a service agreement with DCF, which reiterated many of the requirements of the expectations, which had been entered in the neglect matter.[6]
Lucille was discharged from Clayton house on April 26, 1998, because she was having troubles with the staff and the residents. She was then living in the community and was employed. Her visits with Brittany were increased and were changed to unsupervised visits. There was a clear plan for reunification of Brittany with her mother by the end of the summer of 1998. The DCF narratives indicate that in July, 1998, the DCF social worker believed that reunification efforts were on target.[7]
In her attempts to remain drug-free, Lucille also was involved with the Hartford Dispensary Methadone maintenance program from September 1997 until she was incarcerated in September, 1999. It appears from the record of this facility's drug testing that Lucille had not used drugs during the spring and summer of 1998. The record is not clear about the events in Lucille's life in the summer and early fall, 1998. When, in the fall of that year, the present DCF social worker took over the case, she had difficulty locating Lucille. She did not request or receive the Hartford Dispensary reports about Lucille's urine samples until April, 1999. However, the records are clear that Lucille relapsed in CT Page 4791 September, 1998 and regularly used illegal drugs from October, 1998 through April, 1999.
Because this information was unknown to the new DCF social worker, after she was able to speak to Lucille in January, 1999, she determined to yet once again attempt reunification of Brittany with Lucille. The worker was able to secure the services of an intensive family preservation program for Lucille. At that time, Lucille's oldest child, Anthony, was living with her and she was having trouble handling him. He also was not adjusting to his new school well. Nonetheless, the preservation services were provided. Neither the staff person from the family preservation service nor the DCF social worker was ever able to secure Lucille's work schedule. Finances were also a serious problem for Lucille at that time. Her electricity was about to be shut off and she had trouble paying for day care for Anthony, who was then living with her. Lucille also canceled many visits with the program.
Why these multiple problems were not a warning sign to the professionals, given Lucille's substance abuse history, is unclear. The program assisted Lucille in making sure her electricity was turned on and helped her search for affordable day care. Finally, when the DCF social worker received the April, 1999 report from the Hartford Dispensary concerning Lucille's ongoing drug use, DCF decided to curtail the intensive family preservation services and to file for termination of her parental rights. The petition, however, was not filed for another four months.
At the time of the Hartford Dispensary report, Brittany had been foster care since 1996, more than three years earlier. Lucille's first DCF treatment worker had noted in her transfer summary in early 1998, that permanency planning should begin in this case if Lucille's drug use continued.[8] That internal advice was not followed by either the next worker who thought reunification was possible in July, 1998, nor the present worker who, in January, 1999, set up the intensive family preservation services to assist Lucille in having Brittany returned to her.[9] Under ASFA and its new timelines, which did not apply in 1996 and 1997, permanency for this young child would now be sought much sooner, had she entered the foster care system in 1998.[10] The consequence of the more lenient earlier law and regulations was that Lucille has been given several more opportunities to reunify with her child than she would be able to receive under the present system. CT Page 4792
2. The child, Brittany C.
Brittany was born on May 12, 1995 and is now four years and ten months old. She has been out of her mother's care since July 17, 1996, when she was fourteen months old. Her foster mother testified at length as to her progress and the heroic efforts this family made in the first few years to support reunification with her mother, well beyond what would ordinarily have been expected of them. She testified that she first met Lucille in 1997 and that she arranged for holiday and weekend visits so that Brittany could maintain contact with her half-brother, Anthony. As she put it, she thought that Anthony and Brittany:
 "need to be in contact, now that they are young. When they get to be teenagers, they then will have their own activities and [he will] not want to be involved and spend time with a little sister." It is her hope that "they will remember the times they had as children and be able to get together later on."
She stated that she and her family want to try and maintain contact between the siblings.
The foster mother testified that in 1998 at some point the unsupervised visits that she and her family arranged were the only ones that Brittany had with her mother. She had kept a calendar of those visits[11], detailing the fact that when Lucille had a car and was required to pick up Brittany, many more visits were missed than when this was not the case. She noted that there were many times when Lucille said she would come and she did not. She noted that Brittany stated, after returning from a visit, that "she had a new Daddy." The foster mother stated that she felt "uncomfortable about another person in the house and felt this was not right. It became more complicated than just providing visitation." She stated that she was unable to get a satisfactory response about her concerns from the social worker and finally in September, 1998, she stopped regularly providing unsupervised weekend visits between Brittany and Lucille.
The foster mother testified that she had been informed several times about reunification of Brittany with Lucille and tried to prepare the child for this eventuality. She stated that when she was told that Brittany was going home in eight weeks or so, she believed the child needed more than one hour a week with her mother to prepare for this and DCF did nothing to arrange for such an increase. This was her motivation for assisting in CT Page 4793 providing unsupervised weekend visits to Lucille. When asked about any adverse impact upon Brittany, she stated that she believed that there was none, because Brittany was in a safe and happy home. She stated that in the past, Brittany regularly inquired about her mother, but that since October, 1999, the child has not done so. Visits between Brittany and her mother continue to the present time. The foster mother and the social worker testified that Brittany has adjusted well in this home and she is bonded to her foster parents and the other children in the home.
 B. ADJUDICATION 1. Motion to Dismiss
Connecticut Practice Book (Rev.2000) § 15-8 permits the court to dismiss a case "whenever it determines that, after the plaintiff has produced his evidence and rested his cause, the plaintiff has presented insufficient evidence to establish a prima facie case against the defendant." Season-All Industries,Inc. v. R. J. Grosso, Inc., 213 Conn. 486, 493, 569 A.2d 32
(1980). In considering and ruling on a motion to dismiss, the court must determine whether "sufficient evidence has been submitted to raise an issue to go to the trier of fact." NewEngland Savings Bank v. Bedford Realty Corp., 246 Conn. 594, 608,717 A.2d 713 (1998). "The evidence must be such that, if credited, it would be sufficient to establish the fact or facts it is introduced to prove." Berchtold v. Maggi, 191 Conn. 266,270, 464 A.2d 1 (1983). In evaluating the motion, the plaintiffs evidence "is to be taken as true and interpreted in the light most favorable to [the plaintiff], and every reasonable inference is to be drawn in [the plaintiffs] favor." Angelo Tomasso, Inc.v. Armor Construction and Paving, Inc., 187 Conn. 544, 548,447 A.2d 406 (1982). "A plaintiff has failed to make out a prima facie case "when the evidence produced by the plaintiff, if fully believed, would not permit the trier in reason to find the essential issues on the complaint in favor of the plaintiff."Rosenfield v. Cymbala, 43 Conn. App. 83, 91, 681 A.2d 999
(1996), citing Minicozzi v. Atlantic Refining Co.,143 Conn. 226, 230, 120 A.2d 924 (1956).
Respondent mother, at the close of the petitioner's case, made an oral motion to dismiss the petition. That motion was not based upon the petitioner's failure to prove that Lucille had not rehabilitated, but rather that it had failed to show the necessary predicate facts that DCF had taken reasonable steps to CT Page 4794 reunify Lucille with Brittany. The facts and steps taken are reviewed below.
2. Reasonable Reunification Efforts
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that it "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, provided that this finding is not required if the court has determined at a hearing.. .that such efforts are not appropriate." Connecticut General Statutes § 17a-112 (c)(1). Our Appellate court has stated:
". . . the statutes imposed upon the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the family. The word reasonable (emphases added) is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. . . . [R]easonable efforts means doing everything reasonable, not everything possible." In re TabithaT., 51 Conn. App. 595,, 600, 722 A.2d 1232 (1999).
Respondent mother argues that reasonable efforts were not made and that the court never made a finding pursuant to the statute that such efforts were no longer appropriate. Indeed, it is the gravamen of the respondent mother's claim and motion to dismiss that DCF failed to provide reasonable services to the mother for reunification and therefore failed to make reasonable efforts." Specifically, her claim focuses on DCF's perceived lack of referring her for treatment of her "depression." This failure, she claims, requires dismissal of the termination petition.
The respondent's claim is premised on three factual situations. The first is that the DCF narrative reflects that the investigations worker spoke to Lucille's sister in the summer of 1996. At that time, the sister stated that Lucille had been struggling with depression as she "blamed herself for her father's death about four years after he passed away."[12] The second factual basis is Lucille's own letter from York Correctional facility stating to the DCF social worker that she was "depressed."[13] The third basis for this claim is based on the records of Community Health Services and the testimony of a substance abuse counselor there concerning her individual counseling sessions with Lucille. CT Page 4795
The facts concerning the third claim require further elucidation. The Community Health Services records note that Lucille first applied to this program in January, 1997 and that the counselor met for the first time with Lucille in March, 1998. She met with her sporadically throughout the next year. In September, 1999 Lucille was discharged from this program because there had been no contact with the program for over thirty days. The criminal record reflects that Lucille was again incarcerated during this time.
The substance abuse counselor who met with Lucille individually reported that she had believed that Lucille should be referred to a psychiatrist. When asked why this was so, she replied that "during the course of my time with her, [Lucille] relayed information that she was seen by someone prior and a psychiatrist suggested that it would be something she should look into." In addition, the counselor testified that "she spoke to me and stated that at one time she was on medication and then stopped." The Community Health Services records reflect that the program made five such referrals for Lucille in 1999 and she never attended any of those referrals until February, 2000.
The present DCF social worker testified that she was not aware that Lucille was "depressed" and that she had made no such referrals for Lucille. She also testified that no services were provided to Lucille after April, 1999, despite the fact that DCF did not seek a court finding that further reunification efforts were not required. However, the court discounts the social worker's testimony, as it does not accurately reflect the record.
One of the difficulties with regard to proof of "referral to services," is that the ordinary lay-person's use of this word would appear to mean that DCF took certain steps to refer a DCF-involved parent to some service that was appropriate. The social worker apparently took it to mean this, although DCF itself commonly uses this terminology to mean referral in a much broader sense: that DCF, other agencies or even the parent sought out services. Further, even services for the child can be taken to be reunification services and efforts under ASFA. In this instance, DCF has continued to provide case management services, transportation and visitation to the present time, clearly indicating that reunification efforts continue to be made. The court finds the petitioner established a prima facie case that reasonable efforts were made, treating the evidence in the light most favorable to the petitioner. CT Page 4796
The court also notes, using the terminology "referral to services" in the broadest sense, that since the time of Lucille's involvement with DCF in 1996, she has had an enormous array of substance abuse assessment and treatment services offered her. The exhibits and testimony demonstrate that she was involved in at least five different programs. Those records also demonstrate, by clear and convincing evidence, that many of the substance abuse programs included diagnostic components, providing for diagnoses in accordance with the DSM-IV[14], in order to facilitate proper treatment for Lucille. Nothing in the voluminous records points to Lucille herself reporting this "depression" after her father's death as the causal link sending her into an addict's life. While it is, of course, not the respondent mother's obligation to refer herself to appropriate services, it should be noted that all treatment services require and depend upon the self-report of those individuals to be treated. Such personal reports and histories are central to the analysis over time of what an individual might need and require in her effort to conquer addiction and maintain a sober life. Self-reports raising the spector of serious clinical depression are not part of the exhibits in this case.
Furthermore, the use of the word "depression" by an individual to describe herself or others who she knows is not the same as a diagnosis of "clinical depression" according to the DSM4. In addition, the use of this word by a layperson, the court finds, does not inexorably lead to the conclusion that a subsequent referral for treatment of "clinical depression" by medication is mandated. No professional in the many programs Lucille has attended has diagnosed her as suffering from "clinical depression." Only Lucille's individual counselor at Community Health Services raised this issue and made such a referral. She scheduled five different appointments for Lucille and Lucille herself failed to attend such referral appointments. The referral itself was not based on the counselor's sense that Lucille was "clinically depressed," but on some vague allusions that Lucille herself made to medication she had been taking and that she no longer took.
In this case, the court also ordered a psychological evaluation of Lucille to be performed in 1999, which was never completed, although it was first scheduled in May, 1999 and then again in December, 1999. While respondent mother, through her counsel, wishes to raise the implication that she never received notice of the dates of such evaluations, the court cannot so conclude.[15]
CT Page 4797 There are some obligations that the court imposes upon a parent. One of those, as set forth in the expectations and the service agreement with Lucille, is that she should keep her whereabouts known to DCF and her counsel.[16] This she failed, at repeated times throughout the pendency of this termination petition, to do.
Noting the requirement that DCF must do "everything reasonable, not everything possible," the court finds, from the clear and convincing evidence of the many services offered to Lucille, that those efforts were eminently reasonable. The major obstacle preventing reunification was Lucille's substance abuse, an obstacle that remains as intractable today as it was in 1996. Lucille has failed to benefit from the many inpatient and outpatient substance abuse services she has received and has not taken those steps required of her. She has also failed to attend AA and NA meetings and secure a sponsor.[17]
The court finds Respondent mother's reliance on the claimed failure to treat her "depression" unpersuasive as to the services offered and the reasonable efforts DCF made to assist her in reunifying her with her child. The court denies the Respondent mother's motion to dismiss and finds that reasonable reunification efforts were made, based on the clear and convincing evidence.
2. Adjudicatory Findings
On January 6, 1997, Brittany was adjudicated neglected. She has remained committed to the care and custody of DCF since that time. The court further finds, by clear and convincing evidence, that as of August 8, 1999, Lucille D. had not achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in her life. Connecticut General Statutes § 17a-112 (c)(3)(B). "`Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 532
(1986), see also; In re Juvenile Appeal, 1 Conn. App. 463, 477,473 A.2d 795 (1984). The court concludes Lucille's lack of rehabilitation continued until at least February, 2000 and there is no prospect that she will be rehabilitated within the foreseeable future. Given the long period of time DCF and the various substance abuse treatment providers worked with her, she will not become rehabilitated soon, if ever. She has been actively using heroin and cocaine in the last three and a half CT Page 4798 years and her history of use dates back to 1985. Lucille's inability to rehabilitate herself highlights the fact that giving her the benefit of the doubt so many times only prolonged the limbo in which Brittany was placed.
The statutory framework requires the court to analyze the parent's rehabilitation "as it relates to the needs of the particular child" and consider if such rehabilitation is foreseeable "within a reasonable time." In re Luis C.,210 Conn. 157, 1167. 554 A.2d 722 (1989), In re Hector L.,53 Conn. App. 359, 366-367, ___ A.2d ___ (1999). Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petitions, the court must consider not only Lucille's conduct prior to the filing of the petition, but also her conduct after that time. In this case, this was a period of less than one year, during which time Lucille made no progress.
 C. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (e):
1) Appropriate and timely services were provided by DCF to the family. The services include services to benefit Brittany and many referrals for Lucille to deal with her addiction. DCF also provided visitation and case management services.
2) As previously noted, the court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that reasonable court expectations were set for Lucille and she was not able to even minimally fulfill them.
4) The feelings and emotional ties of the child with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the child for at least one year and with whom the child has developed significant emotional ties. Brittany has developed a comfortable relationship with her foster parents, who wish to adopt her. That relationship has been in existence for more than three years, since her initial placement in September, 1996. CT Page 4799
5) Finding regarding the age of the child: Brittany is four years of age and will be five on May 12, 2000.
6) Finding regarding efforts of the parent to adjust her circumstances, conduct or conditions to make it in the best interests of the child to return her to her home in the foreseeable future and (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with her, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. As detailed above, the court finds that Lucille has not made the changes necessary to accommodate the care and nurturing of this child. While Lucille has visited Brittany regularly, this fact, by itself, cannot overcome her long-standing substance abuse record.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the child by the unreasonable act or conduct of the other parent of the child or the unreasonable act of any other person or by the economic circumstances of the parent. No such conduct is noted. DCF has taken many steps for many years to encourage Lucille to have a meaningful relationship with Brittany, which she has been unable to accomplish. Further, no such conduct is noted as to the biological father of this child.
 D. DISPOSITION
The court concludes, from the clear and convincing evidence, that there is no biological parent ready now or in the foreseeable future, who will be able to care for Brittany. The court concludes, from the clear and convincing testimony, that it is in her best interests to be permitted to have permanency and stability in her life.. Towards that end, the court concludes that it is in Brittany's best interests that her parents' rights her to be terminated. Our courts have noted the "deleterious effect of prolonged temporary care of abused and neglected children." In re Juvenile Appeal (84-CD), 189 Conn. 276,455 A.2d 1313 (1983). In addition, "because of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In re Alexander V., 25 Conn. App. 741, 748,596 A.2d 930 (1992).
The court therefore orders that a termination of parental rights enter with respect to Lucille D. and Bruce C. Given that the CT Page 4800 foster parents have expressed a desire to adopt Brittany, the court directs that they be given first consideration in any adoption. The court further orders that a permanency plan for the child be submitted within sixty days. A review plan for the child shall be filed in accordance with state and federal law.
Barbara M. Quinn, Presiding Judge Child Protection Session