### GEORGE THOMAS ET AL. *v.* CITY OF WEST HAVEN ET AL.
### (SC 15843)

Callahan, C. J., and Borden, Berdon, Norcott and Palmer, Js.

---

Argued March 24—officially released June 29, 1999

*John A. Reed,* with whom were *Wesley W. Horton* and, on the brief, *William C. Turney* and *Paul A. Croce,* legal intern, for the appellants (plaintiffs).

*Joseph L. Rini,* with whom was *Michael P. Farrell,* for the appellees (named defendant et al.).

*Opinion*

BORDEN, J. The dispositive issue in this appeal[1] involves the evidentiary showing necessary to establish a prima facie case of federal equal protection violations against a city, its planning and zoning commission, and certain individual commissioners serving on the commission. The plaintiffs, George Thomas, Barbara Thomas and John Finnell, appeal from the judgment of the court, *Hon. Frank S. Meadow,* judge trial referee, in favor of the defendants, the city of West Haven (city), the city's planning and zoning commission (commission), and two individual commissioners, Donald Lewis and David Saldibar. By that judgment, the trial court granted the defendants' motion to dismiss. The plaintiffs claim that the trial court improperly dismissed their action because they had established a prima facie case that: (1) Lewis and Saldibar had treated them maliciously and selectively in the consideration of their zone change application; and (2) a municipal policy of the city caused the plaintiffs to be deprived of their constitutional rights. We agree with both claims of the plaintiffs and, therefore, we reverse the judgment of the trial court.

---

[1] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

Certain facts and the procedural history are undisputed. In April, 1986, the plaintiffs filed an application with the commission requesting a change in the zoning of two parcels of land that they owned at 770 Campbell Avenue, West Haven.[2] The plaintiffs sought to change the zoning of both parcels from the existing C-2 (commercial local service) and R3-2 (residential two family) to R-5 (residential apartment building),[3] which would allow them to develop condominiums on the property. After a public hearing on May 13, 1986, the commission denied the application with prejudice on May 20, 1986. Saldibar was the chairman and Lewis was the vice chairman of the commission during these proceedings. The plaintiffs appealed from the May 20, 1986 decision[4] to the Superior Court pursuant to General Statutes (Rev. to 1985) § 8-8.[5] In January, 1987, following a trial, the court, *Schimelman, J.*, sustained the plaintiffs' appeal, finding that "[w]ith respect to the claim of predetermination due to the lack of a fair and impartial hearing

[2] The named plaintiff, George Thomas, filed the application on behalf of all of the plaintiffs.

[3] In 1980, when the plaintiffs acquired their interest in the property, it consisted of two separately zoned parcels, C-2 and R3-2. The 1986 request was to change the zoning of both parcels to R-5.

[4] This appeal also included a challenge to the denial by the commission of a zone change request made by the plaintiffs, in the name of T.F. Builders, on June 16, 1986. This request, which was to change the zoning of the parcels from C-2 and R3-2 to CM (mixed commercial/residential), was denied after a public hearing on July 14, 1986. The denial of this zone change request is not at issue in this appeal.

[5] General Statutes (Rev. to 1985) § 8-8 (a) provides: "Any person or persons severally or jointly aggrieved by any decision of said board, or any person owning land which abuts or is within a radius of one hundred feet of any portion of the land involved in any decision of said board, or any officer, department, board or bureau of any municipality, charged with the enforcement of any order, requirement or decision of said board, may, within fifteen days from the date when notice of such decision was published in a newspaper pursuant to the provisions of section 8-3 or 8-7, as the case may be, take an appeal to the superior court for the judicial district in which such municipality is located, which appeal shall be made returnable to said court in the same manner as that prescribed for civil actions brought to said court."

. . . [the] plaintiff[s] [had] sustained [their] burden of proof as evidenced by the record." The plaintiffs subsequently requested a rehearing before the commission on their zone change application, which took place on June 23, 1987. The plaintiffs' application again was denied, and the plaintiffs appealed this decision to the Superior Court. In June, 1988, the court, *Flanagan, J.*, sustained the appeal, finding that "[t]he atmosphere created by the foregoing was one of hostility in which the applicant was unable to obtain the fair and reasonable hearing to which he was entitled."

The plaintiffs then commenced the present action, alleging that the defendants[6] unconstitutionally: (1) had taken their property in violation of the plaintiffs' rights to due process under both the state and federal constitutions; and (2) had denied them their rights, under both the federal and state constitutions, to due process of law and equal protection of the law.[7] The plaintiffs sought redress for their federal claims under 42 U.S.C. § 1983.[8] In August, 1995, on competing motions for summary judgment by the plaintiffs, the city and the commission, the court, *Gordon, J.*, rendered summary judgment in favor of the defendants on the federal due process

---

[6] In their original complaint, the plaintiffs had named as defendants the mayor of the city, Azelio M. Guerra, as well as several other commissioners, namely, Donald Voss, Steven Prindle, Francis Withington, Allen Alderman and Joseph Celentano. Subsequently, the complaint was withdrawn as to these commissioners, and the appeal to this court was withdrawn with regard to Guerra.

[7] The plaintiffs' original complaint in the present action, filed in May, 1989, alleged due process and taking violations only. The plaintiffs subsequently amended the complaint to add allegations of equal protection violations.

[8] Title 42 of the United States Code, § 1983, provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

claims. On June 5, 1996, the commissioners filed a combined motion to dismiss, motion to strike, motion for permission to file summary judgment, and motion for summary judgment. On July 24, 1996, the court, *Booth, J.*, denied the motion to dismiss and the motion for permission to file summary judgment, but granted the motion to strike the state due process claim.[9]

The case proceeded to trial on the remaining counts before the court, *Meadow, J.* After the plaintiffs had completed their case-in-chief, the defendants moved for judgment of dismissal for failure to make out a prima facie case pursuant to Practice Book § 302, now § 15-8.[10] The court granted the defendants' motion to dismiss and this appeal followed.[11]

[9] The plaintiffs have not pursued on appeal either the federal or state due process claims that the courts, *Gordon, J.*, and *Booth, J.*, respectively, rejected prior to trial. After the presentation of the plaintiffs' evidence, the court, *Meadow, J.*, rejected their taking claim. The plaintiffs do not pursue that claim on appeal. Thus, this appeal involves only their federal equal protection claim.

[10] Practice Book § 15-8 provides in relevant part: "If, on the trial of any issue of fact in a civil action tried to the court, the plaintiff has produced evidence and rested his or her cause, the defendant may move for judgment of dismissal, and the judicial authority may grant such motion, if in its opinion the plaintiff has failed to make out a prima facie case. . . ."

[11] Saldibar and Lewis filed a cross appeal raising fifteen preliminary issues. The Appellate Court granted the plaintiffs' motion to dismiss the cross appeal and ordered, sua sponte, that the defendants' preliminary statement of issues be treated as a request, pursuant to Practice Book § 4013, now § 63-4 (a) (1) (B), for appellate review of adverse rulings of the trial court should the plaintiffs prevail on this appeal. Several of these claims may be viewed as, in effect, alternate grounds for affirmance of the trial court's judgment. We decline to consider these issues for several reasons.

First, "[t]he appellee's right to file a § 63-4 (a) (1) statement has not eliminated the duty to have raised the issue in the trial court"; W. Horton & S. Cormier, Rules of Appellate Procedure (1998 Ed.) § 63-4, authors' comments, p. 120; see *Peck* v. *Jacquemin*, 196 Conn. 53, 61–62 n.13, 491 A.2d 1043 (1985). A review of the transcript of the proceeding before the trial court and the memorandum of law submitted in support of the motion to dismiss, indicates that several of the issues listed in the defendants' preliminary statement of issues—for example, the claim that summary judgment should have been rendered in their favor based on qualified immunity—were never presented to the trial court.

## I

The plaintiffs first claim that the trial court improperly dismissed their case because they had "established a prima facie case that . . . Lewis and Saldibar treated the plaintiffs selectively compared with others similarly situated based on a malicious or bad faith intent to injure in violation of [their rights to] equal protection." We agree.

"A motion for judgment of dismissal has replaced the former motion for nonsuit for failure to make out a prima facie case. . . . [S]ee *Lukas* v. *New Haven*, 184 Conn. 205, 210 n.3, 439 A.2d 949 (1981). When such a motion has been granted, the question is whether sufficient facts were proved to make out a prima facie case. *Pignatario* v. *Meyers*, 100 Conn. 234, 239–40, 123 A. 263 (1924)." (Citations omitted; internal quotation marks omitted.) *Falker* v. *Samperi*, 190 Conn. 412, 418, 461 A.2d 681 (1983). "The right of the court to grant such a motion is to be sparingly exercised . . . where the granting of a nonsuit must depend in any appreciable degree upon the court's passing upon the credibility of witnesses, the nonsuit should not be granted; *Pentino* v. *Pappas*, 96 Conn. 230, 232, 113 A. 451 [1921]; where a case is close, the preferable course is to deny a motion for a nonsuit; *Bawol* v. *Gumkowski*, 104 Conn. 746, 133 A. 917 [1926]. *Crowell* v. *Palmer*, 134 Conn. 502, 505, 58 A.2d 729 (1948)." (Citations omitted; internal quotation marks omitted.) *Lukas* v. *New Haven*, supra, 210–11.

Moreover, "issues raised in the defendant's preliminary statement of issues which were not briefed are considered abandoned." *State* v. *Samaha*, 180 Conn. 565, 565 n.1, 430 A.2d 1290 (1980). The claim that the plaintiffs must establish an entitlement to a zoning change as a predicate to their equal protection challenge has not been briefed, nor has the claim that they are immune from suit under the doctrine of qualified immunity.

Finally, we conclude that, in light of the procedural posture of this case, to the extent that any of the defendants' remaining alternate grounds for affirmance were raised properly and remain relevant and unaddressed following our disposition of this appeal, those claims will be resolved more properly in the context of a full trial.

"A prima facie case, in the sense in which that term is relevant to this case, is one sufficient to raise an issue to go to the trier of fact. 9 J. Wigmore, [Evidence (4th Ed. 1974)] § 2494, p. 379. In order to establish a prima facie case, the proponent must submit evidence which, if credited, is sufficient to establish the fact or facts which it is adduced to prove. . . . *Berchtold* v. *Maggi*, 191 Conn. 266, 270, 464 A.2d 1 (1983); see C. Tait & J. LaPlante, [Connecticut Evidence (2d Ed. 1988)] § 4.3, p. 72. In evaluating a motion to dismiss, [t]he evidence offered by the plaintiff is to be taken as true and interpreted in the light most favorable to [the plaintiff], and every reasonable inference is to be drawn in [the plaintiff's] favor. . . . *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, 187 Conn. 544, 548, 447 A.2d 406 (1982)." (Internal quotation marks omitted.) *New England Savings Bank* v. *Bedford Realty Corp.*, 246 Conn. 594, 608, 717 A.2d 713 (1998). "A party has the same right to submit a weak case as he has to submit a strong one. *Fritz* v. *Gaudet*, 101 Conn. 52, 53, 124 A. 841 (1924)." *Falker* v. *Samperi*, supra, 190 Conn. 419.

Further, we have stated that "[t]he decisions of the federal circuit in which a state court is located are entitled to great weight in the interpretation of a federal statute. This is particularly true in 42 U.S.C. § 1983 cases, where the federal statute confers concurrent jurisdiction on the federal and state courts." (Internal quotation marks omitted.) *Red Maple Properties* v. *Zoning Commission*, 222 Conn. 730, 739 n.7, 610 A.2d 1238 (1992). We therefore look to recent decisions of the Court of Appeals for the Second Circuit for guidance on the issues presented in the present case.

"The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution is essentially a direction that all persons similarly situated should be treated alike. *City of Cleburne* v. *Cleburne*

*Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 3254, 87 L. Ed. 2d 313 (1985) (citing *Plyler* v. *Doe*, 457 U.S. 202, 216, 102 S. Ct. 2382, 2394, 72 L. Ed. 2d 786 [1982])." (Internal quotation marks omitted.) *Zahra* v. *Southold*, 48 F.3d 674, 683 (2d Cir. 1995). "A violation of equal protection by selective [treatment] arises if: (1) the person, compared with others similarly situated, was selectively treated; and (2) . . . such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. *LaTrieste Restaurant & Cabaret, Inc.* v. *Village of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994) (quoting *LeClair* v. *Saunders*, 627 F.2d 606, 609–10 [2d Cir. 1980], cert. denied, 450 U.S. 959, 101 S. Ct. 1418, 67 L. Ed. 2d 383 [1981]).[12] [When a plaintiff] does not allege selective treatment based upon his race, religion, or any intentional effort by [the] defendants to punish him for exercising his constitutional rights, [the plaintiff] must demonstrate that [the] defendants maliciously singled [him] out . . . with the intent to injure him." (Internal quotation marks omitted.) *Crowley* v. *Courville*, 76 F.3d 47, 52–53 (2d Cir. 1996).

Viewed in the light most favorable to the plaintiffs, the following evidence was before the court and is relevant to the determination of whether the plaintiffs had established a prima facie case of an equal protection violation by the defendants. In 1980, the plaintiffs[13] had

---

[12] Although the cases cited in support of this standard each involved the alleged selective enforcement of a regulation or ordinance by the defendants against the plaintiffs, selective enforcement is merely a subcategory of selective treatment. The test laid out in *LeClair* v. *Saunders, supra,* 627 F.2d 609–10, is equally applicable to the case at hand, in which the plaintiffs are alleging *both* that the defendants selectively: (1) *enforced* an alleged site plan requirement against them; and (2) *treated* the plaintiffs with an attitude of "disdain, animosity and palpable hostility" that was not exhibited toward other applicants.

[13] In 1980, the group of persons involved in this business venture were George Thomas, John Finnell and Pasquale Egidio. During 1984, prior to

plans to develop an amusement center offering arcade games, pinball and pool tables. For this purpose, the plaintiffs intended to lease the property located at 770 Campbell Avenue, which was, at that time, the site of a boarded up building with ample parking. The property consisted of two separately zoned parcels, R3-2[14] and C-2.[15] Operation as a pool hall was permissible on C-2 zoned property, but operation as a video arcade was considered an "accessory use."[16] Thus, the plaintiffs sought approval from the commission to include video games. At the time that this approval was sought, Lewis was the chairman of the commission. George Thomas testified that Lewis "was highly upset that a pool hall was [already] allowed there and he argued strenuously to prevent [the plaintiffs] from putting the video games there . . . ." Lewis' testimony affirms that he had been opposed to the plaintiffs' intentions for the property.

the filing of any of the applications at issue in this appeal, Egidio left the business partnership and relinquished his interest in the property. Barbara Thomas had acquired title to a portion of George Thomas' interest prior to Egidio's departure in 1984.

[14] A R3-2 district is a general residence district zoned for two-family houses. "These districts are designed to provide types of residential buildings that will permit a broad range of housing types with appropriate standards for each district on density, open space, and spacing of buildings. The various districts are mapped in relation to a desirable future residential density pattern, with emphasis on accessibility to transportation facilities and to various community facilities, and upon the character of existing facilities and open uses which serve the residents of these districts." West Haven Zoning Resolution, art. 2, c. 1-2.2.

[15] A C-2 district is a commercial local service district. Commercial local service districts "are designed to provide for a wide range of essential local services not involving regular local shopping. Since these establishments are less frequently visited by customers, they tend to break the continuity of prime retail frontage and therefore, hamper the development of convenient shopping. The permitted services create relatively few objectionable influences for nearby residential areas." West Haven Zoning Resolution, art. 3, c. 1-2.2.

[16] An accessory use is defined as "[a] land use located on the same lot or on a contiguous lot under the same ownership in all respects as to title and fractional interest which is incidental and subordinate to that of the main building or use of the land." West Haven Zoning Resolution, art. 1, c. 3-2.2.

The plaintiffs ultimately received the necessary approval[17] and entered into the lease. In August, 1981, the plaintiffs exercised their option to purchase the property, and they operated an amusement center on the property until 1984.

After ceasing operation of the amusement center for business reasons, the plaintiffs attempted to lease the property. After being unsuccessful for approximately two years, the plaintiffs decided instead to develop condominiums on the property. On April 21, 1986, the plaintiffs filed a change of zone application with the commission in order to obtain the necessary zone change of both parcels to R-5. The application was presented to the commission on May 13, 1986, at which time Saldibar was the commission chairman and Lewis was the vice chairman.

Lewis characterized the plaintiffs' application as incomplete because it did not include a site plan application. Lewis advised the representative of the architectural firm who spoke in support of the plaintiffs' application that what his client had presented to the commission was not a site plan, and that the plaintiffs "were supposed to come in with a site plan." The director of planning, Michael Roark, clarified, however, that because the plaintiffs were requesting a zone change, it was not necessary that they submit a site plan. In response to Saldibar's insistence that he did not want

---

[17] As highlighted during oral argument before this court, it is not clear from Lewis' testimony whether it was the commission or the police that actually had granted the permit to the plaintiffs to allow them to operate a pool hall. During the trial, however, Lewis expressly stated, after having his memory refreshed with newspaper articles that had been entered into evidence, that he had been opposed to the plaintiffs' intentions to operate an amusement center on the property. Thus, viewing these inconsistencies in favor of the plaintiffs, the inference could be drawn that Lewis had disapproved of the plaintiffs' intentions for the property in 1980, and that this disapproval, which was strong enough to be reported by the local newspapers, negatively predisposed him toward the plaintiffs in 1986.

to continue with the proceeding until the plaintiffs had come back with the "proper documentation," Roark replied that "[the plaintiffs] have the right to the fair process of the law and [a site plan is not required because] they're being heard here on a zone change." After some additional discussion between the commissioners and the plaintiffs' representative, this colloquy occurred again, with Saldibar seeking to halt the proceedings because of the lack of a site plan and Roark advising him that none was needed. After this second exchange, Saldibar appeared to understand that a site plan was not required for a zone change application, and ordered that the hearing continue.

Following several questions from other commissioners, Lewis referred to the plaintiffs' prior use of the property, stating that "[t]his guy made plans for [the amusement center] instead of what we called for and a pool hall . . . . We gave this guy everything. Now he comes with this shit. He's a shrewdy." Saldibar responded that he would "like to have this guy [c]ome back when he's ready," and Lewis moved to "[d]eny with prejudice," prior to the plaintiffs having completed their presentation. Roark instructed the commissioners that they had to listen to the plaintiffs, to which Saldibar responded "alright." Lewis yielded, stating, "[y]ou said we got to listen to him. We do, we listened to him. And that's all there is to it."

The meeting proceeded, with several persons speaking against the proposal, and the plaintiffs' representative being given the opportunity to present a rebuttal. Subsequently, Saldibar asked whether anyone had any comments on the plaintiffs' zone change application, and Lewis responded in the affirmative and was given the opportunity to speak. Lewis recalled the history of the property at issue, stating that, after a fast food restaurant had gone out of business, "[the plaintiffs] converted [the property] into a poolroom and that didn't

do any good. Now they want to put condos and they want to put, make it an R-5. I can't see it. . . . Number one, the fella didn't have the seal,[18] *he didn't have it right, a site plan* so at this time I'd like to make a motion that we deny this [application] with prejudice." (Emphasis added.) The remaining commissioners all seconded the motion to deny the application with prejudice, which Lewis made clear would mean that the plaintiffs "don't come back . . . [f]or a year."

Following their successful appeal to the court, *Schimelman, J.*, the plaintiffs requested a rehearing on their zone change application. On June 23, 1987, with Saldibar and Lewis still holding their respective roles on the commission as chairman and vice chairman, the commission held a public hearing to reconsider the application. After the plaintiffs' application was called, but prior to its presentation, Mayor Azelio M. Guerra addressed the commission to remind it of a certain moratorium that recently had been passed. The moratorium, which had been adopted on August 28, 1986, to be effective September 15, 1986, prohibited, for a certain period of time, the granting of zone change requests that would result in changes to R-5, along with several other zones.

After Guerra had finished speaking and the public hearing was about to resume, Lewis asked Saldibar: "Why are we hearing this?" Saldibar questioned Lewis regarding which application he meant, and Lewis, referring to the plaintiffs' application, stated: "The first one, it was denied twice." The hearing commenced after Saldibar and Lewis were informed by the city's corporation counsel that the plaintiffs' appeal had been sustained because the trial court had found that during

---

[18] Earlier in the proceeding, when Lewis was criticizing the plaintiffs' proposal for lacking a site plan, he stated: "This is not a site plan. A site plan has to have the seal of the architect or an engineer." Thus, Lewis apparently believed that a complete site plan application had to bear the requisite seal.

the prior hearing, "certain procedural violations had occurred that may have created an unfair hearing for the applicant . . . ."

The plaintiffs' attorney, Dennis Garvey, was the first to speak. In light of the decision "[finding] that two of the commissioners who are sitting tonight had predetermined the outcome of the hearing and the reason for the reversal was because of their vote," Garvey requested that alternates be appointed for Lewis and Saldibar. Saldibar replied: "Your request is considered and denied." After Lewis expressed his fear that the plaintiffs "could take [them] to court again and [that they would] lose," they sought the advice of the corporation counsel, who recommended that alternates be appointed.[19] Although the record indicates that Saldibar continued to participate in running the meeting, neither Lewis nor Saldibar voted on the plaintiffs' application.[20]

In considering the plaintiffs' motion to dismiss, the trial court in the present case reviewed the audio tapes of both the May 13, 1986 and June 23, 1987 proceedings. Referring to the point during the June 23 hearing at which Saldibar initially had denied the request to step down and be replaced by an alternate, the court stated: "At this point in the hearing the tapes indicate an attitude of animosity and disdain on the part of . . . Lewis

[19] Before stepping down, both Lewis and Saldibar wanted to know what they had done wrong in the prior proceeding. Lewis stated that he wanted "to know what the hell I did," to which Saldibar responded "Don, Don, take it easy." They subsequently asked Garvey to read them Judge Schimelman's decision.

In its memorandum of decision in the present case, the trial court, who had listened to the audio tapes of both the May and June hearings, stated that "[a]fter hearing the substance of the [Judge Schimelman's] decision the discussion continued in heated tones."

[20] As discussed earlier in the text of this opinion, the plaintiffs' application again was denied unanimously. The plaintiffs again successfully appealed from this decision to the court, *Flanagan, J.* The plaintiffs did not, however, thereafter seek a rehearing from the commission, but instead brought the present action.

and Saldibar for George Thomas. The court concludes that the conversations and comments revealed on these tapes, viewed in the light most favorable to the plaintiffs, demonstrates that Lewis and Saldibar treated . . . George Thomas with animosity and disdain. Accordingly, *the court finds that the plaintiffs have demonstrated that . . . Lewis and Saldibar acted with malice in considering their application of June 23, 1987.*" (Emphasis added.) We agree with this characterization of the evidence, at least insofar as it concludes that the evidence presented *would permit an inference* of malice on the part of Lewis and Saldibar. Thus, although the trial court in its memorandum of decision at times framed its determination in terms of *its findings,* that is not the proper inquiry in ruling on a motion to dismiss under Practice Book § 15-8. On such a motion, the court is confined to determining whether the plaintiff's evidence, *if believed and if given the benefit of all favorable inferences,* makes out a prima facie case. See *New England Savings Bank* v. *Bedford Realty Corp.,* supra, 246 Conn. 608. The court, on such a motion, may not make findings of fact, either favorable or unfavorable to the plaintiff.

The trial court ultimately rejected each of the plaintiffs' claims. With regard to the individual commissioners, the court first concluded "that merely because the [plaintiffs submitted evidence of a number of zone change] applications [that] were before the board on a request for a zone change does not demonstrate that the various applicants were similarly situated for purposes of a claim of equal protection." The trial court subsequently rejected the evidence proffered by the plaintiffs because "[n]one of the applications referred to by the plaintiffs involved a similar zone change request from a commercial/residential zone to a residential zone." Next, the court stated that "even if the court

assume[d], arguendo, that each application was similarly situated . . . the plaintiffs have failed to establish that the commission treated their application selectively. . . . [T]he plaintiffs' evidence does not demonstrate that the commission did not require a site plan from the other applicants during the time that the procedure was in place." The court thus determined that "the plaintiffs ha[d] not met their burden of demonstrating that they were either similarly situated to others or selectively treated." With regard to the city and the commission, the court concluded that "[a] review of the evidence adduced at trial reveal[ed] that the plaintiffs ha[d] not demonstrated that they were denied a constitutional right by the municipal defendants," and dismissed the plaintiffs' claims, stating "that when the evidence is viewed in the light most favorable to the plaintiffs it fails to demonstrate the denial of equal protection . . . ."[21]

We first consider the trial court's conclusion that the evidence submitted by the plaintiffs regarding other zone change applications before the commission was insufficient to allow the inference that these applicants were similarly situated to the plaintiffs. In this connection, we note that, because " 'selective enforcement is a murky [area] of equal protection law in which there are surprisingly few cases' "; *Zahra* v. *Southold*, supra, 48 F.3d 683; and because the cases from the Second Circuit do not provide much guidance on the nature of the "similarly situated" requirement in an action involving an alleged equal protection violation based on selective treatment, we broaden our review to include relevant decisions from other circuits.

In *Esmail* v. *Macrane*, 53 F.3d 176 (7th Cir. 1995), the court considered a case involving facts similar to

---

[21] The trial court also found that the plaintiffs had failed to demonstrate "an unconstitutional taking." As we have indicated; see footnote 9 of this opinion; the plaintiffs do not pursue that claim on appeal.

those before us. The plaintiff, a liquor dealer, alleged equal protection violations against the mayor and city officials who allegedly held a " 'deep-seated animosity' " toward him, which had arisen from prior political dealings between the parties, and from the fact that the plaintiff successfully had appealed a prior revocation of his license. Id., 178. The plaintiff alleged that the mayor had initiated a "campaign of vengeance" against him, that included, among other things, the denial of his liquor license applications "on the basis of trivial or trumped-up charges while maintain[ing] a policy and practice of routinely granting new liquor licenses as well as renewing existing licenses requested by persons who had engaged in the same or similar conduct . . . ." (Internal quotation marks omitted.) Id.

Recognizing that the case before it was "an unusual kind of equal protection case," the Court of Appeals in *Esmail* characterized the plaintiff's complaint as alleging "an orchestrated campaign of official harassment directed against him out of sheer malice." Id., 178–79. The federal District Court had dismissed the action because the plaintiff had not alleged that other applicants had received grants or renewals at the *same* time as he, or that anyone who had committed the *same* violation as the plaintiff had not been sanctioned. The Court of Appeals reversed the District Court's dismissal of the action, concluding that "equal protection does not just mean treating identically situated persons identically. If a bad person is treated better than a good person, this is just as much an example of unequal treatment as when a bad person is treated better than an equally bad person or a good person worse than an equally good person." Id., 179. Applying this rationale to the facts before it, the court concluded that "[i]f the liquor dealers enumerated in [the plaintiff's] complaint committed worse infractions than he was charged with but were let off with lighter or no sanctions, this was

unequal treatment." Id. The court explained that if the plaintiff was able to show that this unequal treatment was "the result solely of a vindictive campaign by the mayor," that conduct would violate the equal protection clause. Id.

We are persuaded by this reasoning, and view it as useful in our determination of whether the plaintiffs were "similarly situated" to other zoning applicants. "[E]qual protection does not just mean treating *identically* situated persons identically." (Emphasis added.) Id. Moreover, the requirement imposed upon "[p]laintiffs claiming an equal protection violation [is that they] identify and relate specific instances where persons situated similarly in all *relevant* aspects were treated differently . . . . *Dartmouth Review* v. *Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989)." (Emphasis added; internal quotation marks omitted.) *Rubinovitz* v. *Rogato*, 60 F.3d 906, 910 (1st Cir. 1995).[22]

In a situation such as that presented by the facts of this case, which involves the alleged selective treatment by public officials who, under the statutes of this state and the regulations of the city, possess broad discretion in decisions relating to zone change applications; see

---

[22] The plaintiffs in *Rubinovitz* v. *Rogato*, supra, 60 F.3d 909, had alleged, among other things, that the selective enforcement of certain state plumbing and gas codes had violated their equal protection rights. Concluding that, "[a]s to code-enforcement . . . the record contains sufficient evidence of selective treatment to forestall summary judgment"; id., 910; the court did not focus on the characteristics of the properties alleged by the plaintiffs to be similarly situated for comparison purposes, but, instead, was persuaded by the fact that the plaintiffs had offered an "affidavit of [the] city plumbing inspector . . . in which he states that (1) he had encountered other instances where there was plumbing but no permits and (2) he did not order the plumbing disconnected, as he had with the [plaintiffs]." Id. Similarly, the focus in the present case should not be on whether the actual properties and the changes requested were identical, but, rather, on whether the applicants were similarly situated with regard to the process and rules to which they were subject.

footnote 26 of this opinion; the factors that render applicants similarly situated for comparison purposes necessarily are based upon the procedural requirements imposed on those seeking to obtain zone changes. The appropriate group for comparison to the plaintiffs, therefore, includes all applicants who were before the commission requesting a zone change during the same general time period as the plaintiffs, and who thus, theoretically, were subject to the same rules and requirements. Furthermore, given the inherently unique characteristics associated with any parcel of land, and the numerous combination of zone changes that could be requested by an applicant, if we were to adopt the narrow focus undertaken by the trial court and advocated by the defendants, the officials and the processes associated with zone changes could be insulated significantly from the purview of the equal protection clause. We do not regard the equal protection clause as so narrow in scope.

We next consider the trial court's determination, emphasized by the defendants on appeal, that "even if the court assume[d], arguendo, that each application was similarly situated . . . the plaintiffs have failed to establish that the commission treated their application selectively. . . . [T]he plaintiffs' evidence does not demonstrate that the commission did not require a site plan from the other applicants during the time that the procedure was in place." According to the court, "[a]t trial, Lewis and Saldibar testified that the commission's procedure was to require a site plan with all zone change applications. The commission discontinued this procedural requirement after the court, *Schimelman, J.*, and the corporation counsel for [the city] informed them that a site plan was not required by the regulations."

Initially, we reiterate that whether the evidence *demonstrated* that the commission actually required a site plan from other applicants during the requisite time

period was not the issue before the trial court on the motion to dismiss, and it is not the issue presented to us. Rather, the issue is whether the evidence presented, viewed in the light most favorable to the plaintiffs, *permitted the inference* that, during the general period of time when the plaintiffs submitted their application, a site plan was not required from those similarly situated to the plaintiffs, namely, zone change applicants generally. We conclude that the evidence supported this inference.

First, there was evidence to support the inference that there had never been a site plan requirement, and that the plaintiffs—who were penalized in May, 1986, for not having a site plan—were treated selectively by the defendants. During oral argument before this court, Lewis and Saldibar conceded that there is not and has never been any requirement that an applicant must submit a site plan with an application for a zone change. This statement is consistent with that made by Roark to Lewis and Saldibar during the May proceedings, in which he advised them that it was not necessary for the plaintiffs to submit a site plan with their zone change application.[23]

Moreover, the city's zoning regulations require "[p]etitioners [for changes in zoning designations to] submit such documents to the Planning and Zoning Commission as is found necessary for reaching a fair and impartial decision, including maps, and preliminary plans, as well as a written description of scope and content of the proposed development. . . ." West Haven Zoning Resolution, art. 7, c. 2-1. During the trial, Saldibar affirmed that there is no mention of a site plan

---

[23] The conversation that occurred during the May, 1986 hearing between the representative who spoke for the plaintiffs and Roark, indicates that after clarifying that the plaintiffs were seeking a "zone change with a conceptual plan that's basically nonbinding," Roark was satisfied that a site plan was not required.

in the regulations' listing of the documents that must accompany an application for a change of zone. In fact, the chapter entitled "Site Plan Review and Approval," is not included in the chapter governing "Requested Changes in Zoning Designations." See West Haven Zoning Resolution, art. 7, c. 4. This, too, was affirmed by Saldibar during the trial. Similarly, the application form for a change in zone designation does not mention a site plan, indicating only that submissions must include a filing fee, maps, "preliminary plans [and] a written description of [the] scope and content of the proposed development." There is no reference to a site plan. During the trial, Lewis confirmed that the zone change application form made no mention of a site plan.

The inference that there never had been a site plan requirement further was supported by evidence indicating that at least two zone change applications had been approved without site plans during 1986. The first application was considered and granted by the commission during its July 14, 1986 meeting. This application requested a zone change from C-2 and R3-2 to R-4, for property located at 996-998 Campbell Avenue. As previously noted, the plaintiffs' property also was zoned C-2 and R3-2. The attorney for Lewis and Saldibar expressly conceded that "going from a C-2, R3-2 zone to either R-4 or R-5" was a "substantially similar" request. Although he further maintained that the zone change *applications* were dissimilar, based, in part, on the alleged differences in the physical areas surrounding both properties,[24] Saldibar contradicted this testimony by testifying that the mix of businesses surrounding the two properties "could be considered similar." Although we previously have concluded that the inference can

---

[24] The attorney also distinguished the properties based on the fact that the site plan requirement purportedly had changed in July, 1986. The evidence regarding when, and if, the site plan requirement was abolished will be discussed in the text of this opinion.

be drawn that *any* zone change application before the commission during 1986 was similarly situated to the plaintiffs' application, we note that, when this testimony is viewed in the light most favorable to the plaintiffs, the inference could be drawn that these properties were, in fact, physically similar.

The second application, which was for property located at 321 Highland Street, was approved by the commission without a site plan on December 9, 1986. The minutes of that hearing indicate the following: "Questions were asked regarding how much area was involved, how many stories and what was the site plan. [The representative for the applicant] responded that there was over an acre involved, that the building would be two . . . stories and shrubs, trees and lawn would be planted." Roark responded that "a site plan review would be required in the future," indicating his recognition that the applicant had addressed all of the questions posed except those regarding a site plan, and that this omission did not preclude the commission from considering the application. The minutes further indicate that it was "Lewis [who] presented a motion to adopt the zone change from R3-1 to C-5 which was seconded . . . . The motion was approved unanimously." At trial, Lewis could not recall having approved this application, and stated that he did not know whether Roark's comments regarding a site plan being required in the future meant that no site plan had been presented to the commission during the December 9, 1986 hearing. Nonetheless, this evidence permits the inference that this zone change application was not accompanied by a site plan application when it was approved by the commission in December, 1986.

Second, there was evidence to support the inference that, even if the commission, as a matter of custom and practice, had imposed a site plan requirement despite

the absence of such a requirement in the zoning regulations, such a custom and practice had ended in either August, 1986, or after the decision by Judge Schimelman was published in January, 1987, and that at least one other zone change application had been approved without a site plan prior to the effective date of the change. This evidence, therefore, further supported the inference that the plaintiffs were treated selectively by the defendants when they were penalized for not having a site plan in May, 1986. Saldibar testified that, although there had been a policy of requiring site plans with zone change applications, this requirement was abolished in either "July or the beginning of August, [1986]." As discussed previously, the plaintiffs offered evidence that the 996-998 Campbell Avenue application for a zone change had been granted without a site plan on July 14, 1986. Thus, viewing Saldibar's testimony most favorably to the plaintiffs, the inference can be drawn that the abolition of the site plan requirement did not occur until August, 1986—after the zone change request for the Campbell Avenue property had been granted without a site plan.

Furthermore, the trial court found that the commission had "discontinued this procedural requirement after the court, *Schimelman, J.,* and the corporation counsel for [the city] informed them that a site plan was not required by the regulations." Although the corporation counsel testified at trial that the change occurred before Judge Schimelman's decision was released, he could not testify as to when the change occurred. The transcript of the June 23, 1987 hearing, however, indicates that on January 15, 1987, the corporation counsel had sent a letter to Saldibar advising him that Judge Schimelman had sustained the plaintiffs' appeal "based upon the confusion which has permeated most of the planning and zoning hearings . . . ." He subsequently recommended an "immediate change

. . . so as to clarify the procedures . . . ." During the June, 1987 hearing, however, Lewis and Saldibar indicated that they were not aware of the January decision and asked that Garvey read it to them. See footnote 19 of this opinion. Thus, viewing this evidence most favorably to the plaintiffs, the inference can be drawn that any site plan requirement was the result of an unofficial practice of the commissioners, rather than an express regulation, and consequently, the change in the site plan requirement occurred in either January or June, 1987, when the commissioners had *actual* notice of the trial court's decision. Under either scenario, it further can be inferred that the application for the change of zone for the Highland Street property that was approved without a site plan in December, 1986, had been approved before the customary practice had been changed.

In summary, when all of the evidence on the alleged site plan requirement is viewed most favorably to the plaintiffs, the inference can be drawn that either there never was a site plan requirement, or that there was an implicit site plan requirement and that this requirement was abolished either: (1) during August, 1986; or (2) at some point after publication of the decision by Judge Schimelman on January 9, 1987; or (3) on June 23, 1987, the date that Saldibar and Lewis first claimed to have learned of Judge Schimelman's decision. Because the plaintiffs, who were penalized for not having a site plan in May, 1986, offered evidence that zone change applications were approved by the commission without site plans during both July and December, 1986, we conclude that the plaintiffs established a prima facie case that they were treated selectively and maliciously by the defendants.

The defendants contend, however, that because neither Lewis nor Saldibar voted at the June 23, 1987 rehearing on the plaintiffs' application, the denial of

the application at that meeting cannot be attributed to their conduct and, therefore, no inference may be drawn that the plaintiffs suffered selective treatment animated by Lewis' and Saldibar's malicious and bad faith intent to injure them. We are not persuaded.

We agree with the decisions of those courts that have recognized that when a government official acts as the moving force behind a deprivation of a plaintiff's constitutional rights, this is sufficient for liability under § 1983. *Malley* v. *Briggs*, 475 U.S. 335, 344 n.7, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986) (§ 1983 is read against background of tort liability that makes one responsible for natural consequences of his actions); *Jeffries* v. *Harleston*, 21 F.3d 1238, 1247 (2d Cir. 1994) ("[a] plaintiff may establish causation under section 1983 if he shows that the defendants participated in, or were 'moving forces' behind, the deprivation"), rev'd on other grounds, 52 F.3d 9 (2d Cir. 1995); *Gutierrez-Rodriguez* v. *Cartagena*, 882 F.2d 553, 561 (1st Cir. 1989) ("[t]he requisite causal connection [for liability under § 1983] can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict constitutional injury"); see also *Warner* v. *Orange County Dept. of Probation*, 115 F.3d 1068, 1071 (2d Cir. 1996) ("an actor [sued under § 1983] may be held liable for those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties").

Thus, the fact that Lewis and Saldibar did not vote on the June 23, 1987 rehearing on the plaintiffs' application is not fatal to the plaintiffs' prima facie case. We conclude that the evidence previously discussed, regarding how Lewis and Saldibar, prominent members of the commission, acted toward the plaintiffs throughout the course of the zone change application review

process, would support the inference that their conduct influenced the votes of the other commissioners.

## II

The plaintiffs next claim that the trial court improperly dismissed their action against the city and the commission because the plaintiffs had established a prima facie case that Lewis and Saldibar, in their capacities as policy makers for the city, caused the plaintiffs to be deprived of their constitutional rights. We conclude that the evidence supports the inference that the actions of the commission, with regard to its consideration of the plaintiffs' zone change application, constituted a municipal policy of the city, and that, therefore, the plaintiffs had established a prima facie case against the city and the commission.

In *Monell* v. *Dept. of Social Services*, 436 U.S. 658, 690, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), the United States Supreme Court overruled in part *Monroe* v. *Pape*, 365 U.S. 167, 81 S. Ct. 473, 5 L. Ed. 2d 492 (1961),[25] and held that "[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury that the government as an entity is responsible under § 1983." *Monell* v. *Dept. of Social Services*, supra, 694.

---

[25] The court in *Monell* v. *Dept. of Social Services*, supra, 436 U.S. 663, overruled *Monroe* only "insofar as it holds that local governments are wholly immune from suit under § 1983," and expressly upheld *Monroe* "insofar as it holds that the doctrine of respondeat superior is not a basis for rendering municipalities liable under § 1983 for the constitutional torts of their employees." Id., 663–64 n.7.

In *Pembaur* v. *Cincinnati*, 475 U.S. 469, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986), the United States Supreme Court further elaborated on the scope of municipal liability under § 1983. In *Pembaur*, the court considered the "official policy" requirement discussed in *Monell*, and concluded that "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." Id., 480. "If the decision to adopt [a] particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." Id., 481. Further defining the limits of this definition, the court held that "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the officials or officials responsible for establishing final policy with respect to the subject matter in question." Id., 483.

Noting that the courts of appeals had not applied these principles consistently, the United States Supreme Court, in *St. Louis* v. *Praprotnik*, 485 U.S. 112, 124, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988), "set out again to clarify the issue that we last addressed in *Pembaur*." The court stated: "Two Terms ago, in *Pembaur* . . . we undertook to define more precisely when a decision on a single occasion may be enough to establish an unconstitutional municipal policy. Although the Court was unable to settle on a general formulation, Justice Brennan's opinion articulated several guiding principles. First, a majority of the Court agreed that municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, that is, acts which the municipality has officially sanctioned or ordered. . . . Second, only those municipal officials who have final policymaking

authority may by their actions subject the government to § 1983 liability. . . . Third, whether a particular official has final policymaking authority is a question of state law. . . . Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business." (Citations omitted; internal quotation marks omitted.) Id., 123. During oral argument before this court, the city and the commission conceded that the first three of these requirements were satisfied in the present case. The question, therefore, is whether there was sufficient evidence to support a finding that the fourth requirement was met.

The United States Supreme Court recently clarified the proof necessary for a plaintiff to prevail in a § 1983 action when he or she is alleging a constitutional violation that consists of a single act by an authorized decision maker of the municipality. In *Board of County Commissioners* v. *Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 628 (1997), the court first affirmed that "it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." Significantly, the court held that "[i]n any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right *necessarily establishes that the municipality acted culpably*. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the *moving force* behind the injury of which the plaintiff com-

---

plains." (Emphasis added.) Id., 405. Finally, the court confined the breadth of its decision by holding that "[a] plaintiff must [also] demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a *particular* constitutional or statutory right will follow the decision." (Emphasis added.) Id., 411.

The defendants conceded, both in their brief and during oral argument before this court, that "the [commission] is capable, in some cases, of making municipal policy . . . ."[26] They maintain, nonetheless, that the plaintiffs failed to establish their prima facie case of an equal protection violation because "a single act does not necessarily become municipal policy . . . and [the plaintiffs] ha[d] not . . . proven [that] there were repeated acts of constitutional violations." Although the defendants are correct in their assertion that a single act does not *necessarily* become municipal policy, the

[26] Our statutes delegate great authority to local zoning commissions. General Statutes § 8-2 (a) provides in relevant part: "The zoning commission of each city, town or borough is authorized to regulate, within the limits of such municipality, the height, number of stories and size of buildings and other structures . . . the density of population and the location and use of buildings . . . . Such zoning commission may divide the municipality into districts of such number, shape and area as may be best suited to carry out the purposes of this chapter; and, within such districts, it may regulate the erection, construction, reconstruction, alteration or use of buildings or structures and the use of land. . . ."

General Statutes § 8-3 (a) provides in relevant part: "Such zoning commission shall provide for the manner in which regulations under section 8-2 and the boundaries of zoning districts shall be respectively established or changed. . . ."

The city's resolution on planning and zoning expressly provided that the "Commission shall have all the powers and duties conferred and imposed by the General Statutes of the State of Connecticut on Planning and Zoning Commissions"; West Haven Zoning Resolution, art. 7, c. 1-4; thereby delegating all of the available state statutory powers to the commission. Thus, there is no question that, at least for the purposes of establishing a prima facie case, the inference can be drawn that the commission acted as a policy maker for the city with regard to denying the plaintiffs' zone change application.

United States Supreme Court has decided that when an "authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right [this] necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the *action* taken or directed by the . . . authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." (Emphasis added.) *Board of County Commissioners* v. *Brown*, supra, 520 U.S. 405. Thus, the defendants are incorrect in their argument that the plaintiffs' action necessarily must be dismissed because of their failure to prove repeated acts of constitutional violations.

In light of the United States Supreme Court's recent decision in *Board of County Commissioners*,[27] and our determination that an inference can be drawn that Lewis and Saldibar selectively treated the plaintiffs in violation of their constitutional rights, we conclude that the plaintiffs submitted evidence sufficient to establish the inference that "the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making pol-

---

[27] The Seventh Circuit Court of Appeals, in one of the few federal cases to have applied *Board of County Commissioners* v. *Brown*, supra, 520 U.S. 405, recently affirmed a jury's verdict in favor of the plaintiff against the defendant county. Explaining its decision, the Court of Appeals noted that the United States Supreme Court had decided that plaintiffs could satisfy their burden of establishing "[a] constitutional injury [that] is caused by a municipal policy, custom or practice . . . with proof that the deprivation of the federally protected right was intentionally caused by the municipality's legislative body or authorized decision-maker." (Citations omitted; internal quotation marks omitted.) *Hulbert* v. *Wilhelm*, 120 F.3d 648, 655–56 (7th Cir. 1997). The Court of Appeals subsequently held that the jury's conclusion that the county was liable to the plaintiff for the county corporation's actions, which included a reprimand and the ultimate downgrading of the plaintiff's job level in retaliation for his exercising his freedom of speech, "was supported by the evidence and consistent with the law on municipal liability as recently explained by the Supreme Court." Id., 656.

icy in that area of the city's business." *St. Louis* v. *Praprotnik,* supra, 485 U.S. 123.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other justices concurred.