DEUTSCHE BANK NATIONAL TRUST COMPANY on behalf of the Certificate Holders Morgan Stanley ABS Capital I Inc. Trust 2005-NC2 Mortgage Pass Through Certificates, Series 2005-NC2, Plaintiff-Respondent,

v.

Patricia A. OLSON and Phillip Olson, Defendants-Appellants,

PNC BANK, NA, Previously Known As Mid America Bank, Previously Known As St. Francis Bank FSB and Medical College of Wisconsin, Inc., Defendants.

Court of Appeals

*No. 2015AP192. Submitted on briefs August 28, 2015.—Decided December 22, 2015.*

2016 WI App 14

(Also reported in 875 N.W.2d 649.)

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Amanda E. Adrian* and *Nicholas Toman* of *Legal Aid Society of Milwaukee, Inc.*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Alyssa A. Johnson* of *J Peterman Legal Group Ltd.*, Brookfield.

Before Curley, P.J., Kessler, J., and Daniel L. LaRocque, Reserve Judge.

¶ 1. CURLEY, P.J. Patricia A. Olson and Philip Olson (collectively, "the Olsons") appeal from a judgment of foreclosure entered in favor of Deutsche Bank National Trust Company on behalf of the Certificate Holders Morgan Stanley ABC Capital I Inc. Trust 2005–NC2 Mortgage Pass Through Certificates, series 2005–NC2 ("Deutsche Bank").[1] On appeal, the Olsons argue that the trial court erred in admitting certain documents under the business records exception to the rule against hearsay, *see* WIS. STAT. § 908.03(6) (2013–14) (the "business records exception"),[2] as evidence supporting Deutsche Bank's claim that the Olsons were in default and owed $140,364.63 on the

---

[1] Bank of America, N.A., as servicer for Deutsche Bank National Trust Company on behalf of the Certificate Holders Morgan Stanley ABS Capital I Inc. Trust 2005–NC2 Mortgage Pass Through Certificate, series 2005–NC2, filed the initial complaint in this matter on April 12, 2012. On April 19, 2013, the trial court entered an order substituting Deutsche Bank as plaintiff after servicing of the Olsons' loan transferred from Bank of America, N.A. to Select Portfolio Servicing, Inc. on or about September 1, 2012. An amended complaint was filed on October 7, 2013.

[2] All subsequent references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

We also note that although we refer to WIS. STAT. § 908.03(6) in this decision as the "business records exception," § 908.03(6) is not limited to "business records," but rather, extends to any records of regularly conducted activity. *See Bank of America NA v. Neis*, 2013 WI App 89, ¶ 6 n.5, 349 Wis. 2d 461, 835 N.W.2d 527.

principal balance of the loan plus interest of $68,953.21 as of the date of the trial under the terms of the note and mortgage. Had the trial court not admitted those documents, the Olsons argue, there would have been insufficient evidence to support Deutsche Bank's foreclosure claim because Deutsche Bank would have failed to establish the amount due and owing. We conclude that the trial court did not err in admitting the documents at issue as business records under § 908.03(6); therefore, we affirm.

### BACKGROUND

¶ 2. This appeal involves a foreclosure judgment entered in favor of Deutsche Bank after a court trial. Per the amended complaint, on or about December 8, 2004, the Olsons signed a note for $144,000 that was secured by a mortgage on their home. The original lender for that loan was New Century Mortgage Corporation, and the note was later transferred to Deutsche Bank. Various loan mortgage servicers serviced the Olsons' loan. At the time the complaint was filed, Bank of America, N.A. ("Bank of America"), was the servicer for the Olsons' loan; however, servicing was thereafter transferred to Select Portfolio Servicing ("SPS") on or around September 1, 2012, and SPS was the mortgage loan servicer for the Olsons' loan at the time of the court trial.

¶ 3. Deutsche Bank moved for summary judgment; however, the trial court denied the motion, finding that a genuine issue of material fact existed as to the authenticity and date of the endorsement on the note and that Deutsche Bank had failed to make a *prima facie* case for default and the amount due on the

loan.[3] The matter was set for trial before the court, which took place on July 23, 2014.

¶ 4. At the outset of the trial, the court accepted a signed stipulation wherein the Olsons agreed that they had signed the note and mortgage at issue. Certified copies of the note and mortgage were marked as exhibits and received into evidence.[4] Patricia Olson's testimony confirmed that the Olsons signed the note. When questioned about payments made on the note, Ms. Olson was unable to recall when they had last made a payment. She testified that she believed that they began to fall behind on their loan payments in 2007, and she confirmed that they had not made any payments on the loan from 2009 through 2014. She also testified that she could not recall whether they had made any property tax payments from 2008 through 2012.

¶ 5. Suzanne Johnstone, who at the time of trial had been employed by SPS for approximately nine years and had been a Document Control Officer for approximately the past four years, testified extensively

---

[3] Deutsche Bank initially filed its summary judgment motion on July 29, 2013. The Olsons thereafter filed a motion to amend their pleadings, and the court entered a new scheduling order. Deutsche Bank renewed its summary judgment motion on December 11, 2013.

[4] Because the Olsons challenged the timing and validity of the endorsement placed on the Note at trial, the Olsons objected to the Note being received into evidence. The trial court received that exhibit subject to the Olsons' objection concerning the endorsement, and the trial court ultimately ruled against the Olsons on their challenge to the timing and validity of the endorsement, concluding that Deutsche Bank did have standing to bring the foreclosure action. The trial court's ruling as to the timing and validity of the endorsement to the Note is not at issue on appeal.

both as to her work and training at SPS and as to SPS's business methods and procedures as a loan servicer. Johnstone explained that SPS is a residential mortgage servicer, and residential mortgage servicers "collect payments on residential mortgages. Collect payments, process payments, and in the case of default they may accelerate and complete foreclosure actions on behalf of Note Holders." In her role as a Document Control Officer, Johnstone reviewed loan files and executed documents, and in her prior position as a Client Relations Manager at SPS, she "worked with lien holders or investors, owners of the Notes, master servicers, oversight agents, and trustees."

¶ 6. Johnstone confirmed that based on her nine years of experience at SPS, she was familiar with how SPS keeps its loan records, that she had been trained on SPS's loan record computer systems, and she estimated she had over 200 hours of training on those systems. Her training included: (1) an overview of the system used to maintain and record the system of records; (2) the process involved in applying and processing loan payments and processing letters, accelerating loans, and the foreclosure and bankruptcy processes; (3) training in handling payments; and (4) how loans are transferred in and out of SPS.

¶ 7. In explaining "how loans come in and out of SPS[,]" Johnstone explained that SPS does not always service a loan for the full life of the loan, e.g., "from origination to liquidation," and that loans may be transferred to or from SPS during the life of the loan. Johnstone testified that she was trained on SPS's procedures for integrating business records when a loan is transferred from another servicer to SPS, and that training included a review of the communication process between SPS and the prior loan servicer when

a loan was transferred to SPS for servicing, as well as training on how the data is reviewed and how quality control checks are applied before the loan is "boarded" to SPS's system.[5] Johnstone also provided a detailed explanation of the quality control process that SPS employs when it takes over servicing of a loan from another loan servicer. She stated that:

> Before a loan is boarded to the system, the data that is provided by the prior servicer that includes origination data, the date the loan was originated, the original balance, the interest rate, whether it's an ARM loan – by ARM, adjustable rate mortgage or a fixed rate mortgage – it is QC'd [quality control] and checked. There are over I think a hundred logical checks and balances to confirm that the data they have is correct.

¶ 8. Johnstone then explained the series of events that occur when SPS takes over servicing of a loan from another servicer: SPS receives notification of an incoming transfer, SPS then receives a preliminary data tape prior to the transfer, and "[t]he data tape contains data that is related to the loan that's coming in, the origination date, the amount, first payment due date, next payment due date, current balance, interest rate, and the borrower information[,]" as well as "any other information that may relate to advances and disbursements that have been made." She also explained that over one hundred quality control checks and balances are run on the data provided on the preliminary data tape and that the data is "loaded into a preliminary boarding system so that those checks can be run." Additionally, she

---

[5] "Boarding" refers to the process by which SPS takes over servicing of a loan.

testified that "[t]he Notes are actually all reviewed to ensure that the index information, the rate information, and the payment change information or the rate change information is correct prior to boarding" and that if something does not make sense, SPS will "communicate with the prior servicer."

¶ 9. Johnstone also confirmed that based on her training and experience, SPS works with the prior servicer during the boarding process to ensure that the loan records and information, including payment amounts made, are true and correct. If an exception is triggered by any of the quality control checks and balances during the loan boarding process, Johnstone explained that SPS must communicate those exceptions to the prior servicer and they must be resolved prior to boarding the loan to SPS's system.

¶ 10. After confirming the validity and accuracy of the data provided by the prior servicer during the boarding process, payment histories from the prior servicer are integrated and maintained in SPS's records system. If a loan was in default at the time service transferred to SPS, the default date would also be integrated and maintained in SPS's records system, as would the current principal balance. Johnstone stated that SPS relies on those records in the normal course of its business as a loan servicer and that she believes that those records are, in fact, reliable.

¶ 11. After confirming that SPS was servicing the Olsons' loan at the time of trial, Johnstone also described the system that SPS uses to access the Olsons' loan information. She explained that the computer system SPS uses is called the Mortgage Servicing Platform ("MSP") and that SPS uses that system for keeping track of payments—where SPS records

"the payment history, loan information, contact history, any disbursements or advances that have been made on the loan, all contact with the borrower, and any other process that's handled such as loss mitigation, foreclosure, bankruptcy would be maintained within that system." Johnstone was aware that a loan's payment history is recorded in the MSP system based on her training and personal use of that system.

¶ 12. In addition to testifying about the MSP system that SPS uses, Johnstone testified that based on her training and experience, it is SPS's procedure that the SPS employees involved in integrating the prior servicer's records into SPS's system at the time of the transfer, and the SPS employees involved in the payment processing and escrow departments that actually enter information into the MSP system, have personal knowledge of the records that they are integrating and the information they are entering.

¶ 13. Beyond testifying as to SPS's procedures for record integration and maintenance during the boarding process and SPS's loan servicing process in general, Johnstone also testified that she had reviewed SPS's records for the Olsons' loan and confirmed that based on her review, experience, and training, it was her belief that the records of the prior servicer for the Olsons' loan had been integrated into SPS's business records and that those records were created, maintained, and integrated in the regular course of SPS's business.

¶ 14. Specifically, Johnstone testified as to certain SPS documents, marked as Exhibit 6, specifically pertaining to the Olsons' loan. Those documents were screen print-outs of the pay-off fees for the Olsons' loan from the MSP system, and Johnstone explained that

729

SPS uses those documents to "easily access and determine the amount due and owing on a loan in regard to the current principal balances, net balance, any advances that have been made, and the accrued interest." Johnstone also testified that the loan payment history for the Olsons' loan, marked at trial as Exhibit 7, was a record that SPS created using its proprietary LSAMS system, which "SPS uses to maintain a prior servicer payment history in a fashion that is accessible to all employees of SPS should they need to refer to it." That document integrated the Olsons' loan payment history as provided by the prior loan servicer during SPS's onboarding process, and Johnstone testified that SPS uses that document "to track and maintain the current balance and any advances or disbursements that have been made on the loan."

¶ 15. When asked about the principal balance on the Olsons' loan, Johnstone testified that based on SPS documents in the MSP database, the principal was $140,364.63. She also testified that per the amounts listed on those documents, the loan was paid through December 1, 2007, that the interest rate at that time was 7.6 percent, and that the accumulated interest was $68,953.21 as of July 23, 2014, the date of trial. Johnstone also confirmed that the loan history documents for the Olsons' loan showed that no payment had been made on the Olsons' loan after March 2008.

¶ 16. At the conclusion of the trial, the court admitted Exhibits 6 and 7 and also confirmed that it would accept additional post-hearing briefing, including the parties' proposed findings of facts and conclusions of law, which the parties filed on September 30, 2014. The trial court issued its written decision and order granting foreclosure in favor of Deutsche Bank

on October 28, 2014, and judgment of foreclosure was entered on December 10, 2014.

¶ 17. In its written decision and order granting judgment of foreclosure in favor of Deutsche Bank, the trial court specifically found, as it relates to this appeal, that: (1) the Olsons were in default; (2) the Olsons did not dispute the amount asserted to be due and owing with any evidence to the contrary; (3) Johnstone was a credible and knowledgeable witness and that she had provided extensive testimony regarding SPS's process for integrating a prior servicer's business records into its own; (4) Johnstone testified that SPS relies on the business records of a prior loan servicer; (5) Johnstone testified that SPS worked with the prior servicer in integrating the business records; and (6) Johnstone "had the requisite personal knowledge to meet the requirements of Wis. Stat. § 908.03(6) in order to admit Exhibits 6 and 7 under the hearsay exception for records of regularly conducted activity." Having concluded that Exhibits 6 and 7 were admissible, the trial court found that $140,364.63 was due and owing on the principal balance of the Olsons' loan and that the accrued interest due and owing was $68,953.21, bringing the total amount owed to $209,317.84.

¶ 18. The Olsons now argue that the trial court erred in admitting Exhibits 6 and 7, which the Olsons assert comprise the only evidence admitted in support of Deutsche Bank's claim that the Olsons were in default and that they owed the amount claimed. The Olsons argue that the trial court erred because Johnstone, an employee of SPS, was unqualified to testify as to the underlying data because that data was created by Bank of America and not SPS, Johnstone's

employer.[6] Accordingly, the issue on appeal is whether the trial court erred in admitting two documents—Exhibit 6 and Exhibit 7—under WIS. STAT. § 908.03(6), the business records exception to the rule against hearsay.[7]

## ANALYSIS

### I. Standard of Review

¶ 19. The parties dispute the appropriate standard of review to be applied in determining whether the trial court erred in admitting Exhibits 6 and 7 under the business records exception. The Olsons, citing *State v. Stevens*, 171 Wis. 2d 106, 111–12, 490 N.W.2d 753 (Ct. App. 1992), suggest that the ad-

---

[6] In their briefs, the Olsons repeatedly argue that in order for Exhibits 6 and 7 to have been admissible under the business records exception, Deutsche Bank was required to present a witness from Bank of America, the predecessor to SPS. Although the Olsons' briefs also state that there were loan servicers prior to Bank of America, the Olsons do not raise any argument as to whether witnesses from those loan servicers prior to Bank of America were also required to the extent that the amount due and owing relied upon records of those prior loan servicers in addition to the Bank of America records.

[7] At trial, the Olsons also argued that the evidence was insufficient to establish that Deutsche Bank was the holder of the note. Because the Olsons did not brief this argument on appeal, we deem this argument, and any other argument raised before the trial court but not presented on appeal, abandoned. *See, e.g., A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 491–92, 588 N.W.2d 285 (Ct. App. 1998) (issues raised before the trial court but not raised on appeal are deemed abandoned).

missibility of hearsay evidence is a question of law that we review *de novo*. Deutsche Bank, to the contrary, suggests that we should apply the discretionary standard, citing to *State v. Buelow*, 122 Wis. 2d 465, 476, 363 N.W.2d 255 (Ct. App. 1984), and *Christensen v. Economy Fire & Casualty Co.*, 77 Wis. 2d 50, 55–56, 252 N.W.2d 81 (1977), for the proposition that the admissibility of business records under the business records exception is a discretionary determination that an appellate court will reverse only where the trial court either abused its discretion or exercised its discretion based upon an erroneous view of the law.

■■

¶ 20. "The decision of a trial court on admission of hearsay evidence is within the trial court's discretion and will not be reversed unless discretion is abused or the court's decision is based on an erroneous view of the law." *Stevens*, 171 Wis. 2d at 111. Not all evidentiary rulings, however, are discretionary. *See Palisades Collection LLC v. Kalal*, 2010 WI App 38, ¶ 14, 324 Wis. 2d 180, 781 N.W.2d 503. Rather, "if an evidentiary issue requires construction or application of a statute to a set of facts, a question of law is presented" and we review that question of law *de novo. See id.* We therefore apply the *de novo* standard of review because the Wis. Stat. § 908.03(6) issue in this case turns on the application of a legal standard to the testimony provided as to Exhibits 6 and 7.[8]

---

[8] We note that our decision in this case would ultimately be the same under either standard, however.

*II. The trial court did not err in admitting Exhibits 6 and 7 under the hearsay exception for records of regularly conducted activity as provided for in WIS. STAT. § 908.03(6).*

■

¶ 21. The evidentiary rule at the heart of this dispute is WIS. STAT. § 908.03(6), the rule providing for an exception to the rule against hearsay for records of regularly conducted activity. That rule states:

> RECORDS OF REGULARLY CONDUCTED ACTIVITY. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, all in the course of a regularly conducted activity, as shown by the testimony of the custodian or other qualified witness, or by certification that complies with s. 909.02 (12) or (13), or a statute permitting certification, unless the sources of information or other circumstances indicate lack of trustworthiness.

Whether the records at issue—Exhibits 6 and 7—are admissible pursuant to that rule is key to this case because the trial court relied upon those documents in determining that Deutsche Bank had established the amount due and owing on the Olsons' loan.

¶ 22. We note at the outset that in arguing that the documents at issue are not admissible pursuant to the business records exception, the Olsons do not appear to dispute that Johnstone, the witness who laid the foundation for admission of Exhibits 6 and 7, is qualified to testify as to *SPS's records*. Rather, what the Olsons appear to argue is that because the data incorporated into SPS's records is primarily comprised of data that it received from a third party, Bank of

America, Johnstone is not qualified to testify as to the *underlying data*—particularly the amounts due and owing on the Olsons' loan—because she does not have personal knowledge of *Bank of America's* record keeping process, and therefore the SPS records are not admissible to establish the amount due and owing.[9] As we explain, Johnstone was qualified to testify as to Exhibits 6 and 7 because those records were records created by SPS, and because Johnstone provided extensive testimony as to SPS's quality control checks and boarding process in integrating the Bank of America data into SPS's own records.

¶ 23. The Olsons and Deutsche Bank rely on our decisions in *Palisades* and *Central Prairie Financial LLC v. Yang*, 2013 WI App 82, 348 Wis. 2d 583, 833 N.W.2d 866, respectively. Both cases, decided at the summary judgment stage, involved collections lawsuits in which the admissibility of records establishing the amount due and owing were challenged.

¶ 24. In *Palisades*, the issue before this court was whether the trial court had erred in granting summary judgment in favor of the collections company because the affidavit it submitted did not show the requisite personal knowledge required to establish admissibility of the account statements under the business records exception. *Id.*, 324 Wis. 2d 180, ¶ 1. There, Palisades presented an affidavit in which the affiant testified that the account records attached to the affidavit were true and correct copies of the statements. *Id.*, ¶ 4. We

---

[9] There does not appear to be a dispute as to whether the Olsons are actually in default, as Patricia Olson's own testimony confirms that the Olsons have not made any loan payments since approximately 2008. Moreover, the Olsons identify only "the amount due and owing on the note" as the element of a foreclosure action that they contest on appeal.

concluded that the affidavit was not sufficient to establish a *prima facie* case for summary judgment because the affiant, an employee of Palisades, was not qualified to testify as to the account records at issue because the account records submitted were records of Chase Manhattan Bank—not Palisades—and therefore, the account records were not admissible under the business records exception. *Id.*, ¶ 1.

¶ 25. In *Yang*, which Deutsche Bank relies heavily upon, Central Prairie sued Yang to recover debt for purchases made with a Chase credit card. *Id.*, 348 Wis. 2d 583, ¶ 2. The trial court granted summary judgment in favor of Central Prairie, and on appeal, Yang argued that the affidavit and records that Central Prairie submitted were not sufficient under the *Palisades* standard. *Yang*, 348 Wis. 2d 583, ¶ 1. We disagreed with Yang, finding that the affidavit supported the conclusion that the account statements submitted were admissible under the business records exception because the affidavit was more detailed than the affidavit presented in *Palisades*, because the Central Prairie affiant confirmed his own personal knowledge of Central Prairie's regular practices and procedures, because the affiant averred to the process by which a predecessor's records were regularly integrated into Central Prairie's records, and because Central Prairie had also submitted affidavits from each of its predecessors. *See Yang*, 348 Wis. 2d 583, ¶¶ 3, 7–13.

¶ 26. Although the Olsons argue that this case falls under *Palisades* and Deutsche Bank argues that it falls under *Yang*, this case is neither a *Palisades* case nor a *Yang* case, as Deutsche Bank certainly went further than the collections agency in *Palisades* because it did not simply submit a third party's records,

but it did not go quite so far as the collections agency in *Yang* because it did not present admissible affidavits or certifications from each of SPS's predecessors. In other words, if *Palisades* and *Yang* are viewed on a continuum in terms of the ultimate admissibility of records of a predecessor, this case falls somewhere in the middle.[10]

¶ 27. Unlike in *Yang*, a case decided on summary judgment that included affidavits from all of the prior servicers, the only witness that testified here as to the amount due and owing on the Olsons' loan was SPS employee Johnstone—there were no witnesses that testified as to the record process employed by any of the prior mortgage loan servicers for the Olsons' loan. This alone differentiates the testimony presented in support of the admissibility of Exhibits 6 and 7 in this case from the affidavits presented in support of the records in *Yang*. *See id.*, 348 Wis. 2d 583, ¶¶ 7, 8–12.

¶ 28. This case is also distinguishable, however, from *Palisades*, where the records attached to the Palisade's employee's affidavit in support of summary judgment were actually records created by a third party. *See id.*, 324 Wis. 2d 180, ¶ 4. Here, instead, Johnstone, an SPS employee, testified as to SPS's process for onboarding loans and creating records, and the specific records she referenced during her testimony were records that SPS—not any other entity—created.

---

[10] We note that both *Palisades Collection LLC v. Kalal*, 2010 WI App 38, 324 Wis. 2d 180, 781 N.W.2d 503, and *Central Prairie Financial LLC v. Yang*, 2013 WI App 82, 348 Wis. 2d 583, 833 N.W.2d 866, were appeals from summary judgment decisions, whereas this appeal is from evidentiary rulings made during a court trial after extensive witness testimony.

¶ 29. What makes this case particularly unique compared to other cases we have decided, particularly *Palisades* and *Yang*, is that the records at issue here —Exhibits 6 and 7—are, as noted, records that SPS created in the regular course of its business, as testified to by Johnstone. However, a portion of the *information contained in those records* was transferred to SPS from Bank of America and thereafter integrated into SPS's *newly created* records when SPS took over servicing of the Olsons' loan. It is the integration of the Bank of America records into SPS's records, and SPS's reliance on the Bank of America records, that lies at the center of our discussion.

¶ 30. We have previously acknowledged, at least minimally, the concept of integration in discussing the admissibility of third-party documents in the context of the business records exception. In *Yang*, for example, we noted that Central Prairie's affiant averred that Central Prairie had integrated the records of a third party into its own business records. *Id.*, 348 Wis. 2d 583, ¶¶ 2, 10. In our discussion in *Yang*, we stated:

> [T]he affidavit of Central Prairie's own record custodian confirms his personal knowledge of Central Prairie's regular practice of purchasing defaulted Chase accounts and receiving transmission of "electronic account information at the time the accounts are assigned," along with the terms and conditions and account statements, which records are regularly "*integrated . . . from Chase Bank USA, N.A. into [Central Prairie's] own business records.*" *This aspect alone, the custodian's explanation of the regular processes by which Chase's electronic account records are transmitted to its assignees, already differentiates this case from Palisades, where the affiant had no apparent knowledge of how Chase prepared its accounts.*

738

*Yang,* 348 Wis. 2d 583, ¶ 10 (omission and second bracket in *Yang;* emphasis added).

¶ 31. Despite our recognition in *Yang* that the affiant's discussion of Central Prairie's integration of Chase's records into its own played a role in differentiating that case from *Palisades,* we did not further elaborate on the issue of integration in regard to the business records exception.[11] We take the opportunity to do so now.

¶ 32. Deutsche Bank, perhaps recognizing that *Yang* does not fit squarely with the facts at hand, directs our attention to the Eighth Circuit's decision in *Brawner v. Allstate Indemnity Co.,* 591 F.3d 984 (8th Cir. 2010), which discusses an entity's integration of a third party's records in relation to Federal Rule of Evidence 803(6), the federal counterpart to Wis. Stat. § 908.03(6).[12]

---

[11] This may be because Central Prairie, unlike Deutsche Bank, " 'produced affidavits executed by each of its predecessors in interest, going back to the original creditor.' " *Yang,* 348 Wis. 2d 583, ¶ 3. We note that although Deutsche Bank did seek to admit certified records of Bank of America under Wis. Stat. § 909.02(12), the trial court did not admit those records at trial and we therefore do not consider those records on appeal.

[12] It is well-settled that we may look to federal case law, although not binding on this court as to the construction of Wisconsin statutes, as "persuasive authority in construing an analogous state rule." *State v. King,* 205 Wis. 2d 81, 92, 555 N.W.2d 189 (Ct. App. 1996).

Federal Rule of Evidence 803, like Wis. Stat. § 908.03, provides for certain exceptions to the rule against hearsay regardless of the availability of the declarant, and other than a few minor differences, the federal and state rules are substantially the same. Federal Rule of Evidence 803(6) provides that the following is not excluded by the rule against hearsay:

A record of an act, event, condition, opinion, or diagnosis if:

¶ 33. In *Brawner*, the parties disputed whether the appellants had coverage under their insurance policy for a fire that destroyed their home, which was in foreclosure at the time of the fire. *Id.*, 591 F.3d at 985. At trial, the jury found in favor of the insurance company, and the appellants argued on appeal that the district court had erred in admitting multiple hearsay documents over their objections. *Id.* at 986.

¶ 34. Two of the documents at issue were documents from the bank's foreclosure file, both of which had been drafted by a third party. *Id.* at 987. The first was a letter from the Veterans Administration ("VA") to the bank acknowledging that it had received notice that the home was under foreclosure (the VA had guaranteed the mortgage loan), and the second document was a letter signed by a VA employee imposing a deadline by which the foreclosure must be completed. *Id.*

**(A)** the record was made at or near the time by—or from information transmitted by—someone with knowledge;

**(B)** the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

**(C)** making the record was a regular practice of that activity;

**(D)** all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

**(E)** the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

While the format of Federal Rule of Evidence 803(6) differs from that of Wis. Stat. § 908.03(6), the general requirements for establishing the exception under both the federal and state counterparts are substantively identical.

740

¶ 35. At trial, the insurance company introduced those two documents to prove that the VA had been on notice of the foreclosure action, and it introduced the documents through the bank's foreclosure supervisor. *Id.* On appeal, the Brawners argued that the district court had erred in admitting those documents into evidence over their objection because they were drafted by the VA and not the bank and were therefore inadmissible hearsay because proper foundation had not been laid by the testifying witness, a bank employee. *Id.* at 986–87.

¶ 36. The Eighth Circuit rejected the Brawners' argument, noting that "[s]everal other courts have held that a record created by a third party *and integrated into another entity's records* is admissible as the record of the custodian entity, *so long as the custodian entity relied upon the accuracy of the record and the other requirements of Rule 803(6) are satisfied.*" *Brawner,* 591 F.3d at 987 (emphasis added). The *Brawner* court thus concluded that it was not necessary "to produce an individual from the entity that prepared the record to establish a foundation," and it therefore found that the trial court had not abused its discretion in admitting those documents. *Id.*[13]

██

¶ 37. We find persuasive *Brawner's* conclusion that where the elements of the business records exception are otherwise met, third-party records can fall

---

[13] The Eighth Circuit also considered two other documents in *Brawner v. Allstate Indem. Co.*, 591 F.3d 984, but the court emphasized that it was not clear that those two documents contained hearsay as opposed to evidence of information that the insurance company relied upon during the course of its investigation into the fire at the Brawners' home. *Brawner v. Allstate Indem. Co.*, 591 F.3d 984, 988 (8th Cir. 2010).

within the business records exception where the party offering the records for admission into evidence establishes that the third-party's records are integrated into that party's business records and that that party relies upon those records.

¶ 38. It is well understood today that "[t]he problem of proving a debt that has been assigned several times is of great importance to mortgage lenders and financial institutions," *New England Savings Bank v. Bedford Realty Corp.*, 717 A.2d 713, 720–21 (Conn. 1998), and as other courts have noted, the buying and selling of loans is a common practice and "[g]iven the common practice of banks buying and selling loans . . . it is normal business practice to maintain accurate business records regarding such loans and to provide them to those acquiring the loan." *See Beal Bank, SSB v. Eurich*, 831 N.E.2d 909, 914 (Mass. 2005); *see also Bedford Realty Corp.*, 717 A.2d 713. This is such a case, as the Olsons' loan has been transferred multiple times.

¶ 39. At trial, Deutsche Bank presented the testimony of Johnstone, a long-time employee of the current servicer of the Olsons' loan. Johnstone provided ample testimony in regard to SPS's regularly conducted practices and procedures concerning the reliance upon and integration of a prior loan servicer's records when SPS takes over servicing of a loan and creates its own records based upon the prior servicer's loan, and Johnstone also provided significant testimony as to her training in and personal knowledge of these practices and procedures based on her nine years at SPS.

¶ 40. The Olsons argue that the integration and reliance argument in favor of admissibility of a third-party's records under the business records exception is

"meaningless" because all foreclosure plaintiffs seeking to admit loan records created by third parties into evidence presumably rely on those records. While we do not doubt that a subsequent loan servicer will typically rely on and integrate the records of a prior loan servicer into its own records in some manner, Johnstone did far more than simply testify that SPS integrated and relied upon the data and information provided by a prior servicer during the boarding process. Rather, Johnstone testified extensively as to her personal knowledge of SPS's policies and procedures for creating its own records and integrating the prior servicer's records when taking over the servicing of a loan from another loan servicer, as well as to the extent that SPS relies on those records in the course of its own regular business practice.

¶ 41. Johnstone's extensive testimony in this regard unquestionably distinguishes this case from the numerous cases relied upon by the parties, particularly because many of those cases involved the admissibility of records attached to a summary judgment affidavit rather than actual testimony presented at trial, as was the case here.[14] Her testimony also distinguishes this case from *Palisades*, the primary case relied upon by the Olsons, as we noted in *Yang* that "*Palisades* stands for the extremely narrow proposition that the hearsay exception for business records is not established when the only affiant concerning the records in question lacks personal knowledge of how the records were made." *Yang*, 348 Wis. 2d 583, ¶ 9. Johnstone clearly had personal knowledge of how and

---

[14] Indeed, Johnstone's testimony took over one hundred pages of the trial transcript, which is over half of the entire trial transcript.

when the records contained in Exhibits 6 and 7—records that were SPS's own records—were created.[15]

¶ 42. We also emphasize that Johnstone testified as to the extensive quality control checks—over one-hundred according to her testimony—that SPS conducts when it receives data from a prior loan servicer, and she also explained that any issues that arise during those checks must be resolved prior to completing the onboarding process. Thus, SPS does more than simply copy and paste a prior servicer's records into its own, as the Olsons suggest.

¶ 43. The trial court in this case aptly noted that reliability is key in determining the admissibility of Exhibits 6 and 7. In so recognizing, the trial court questioned the Olsons' apparent position that, at least in this case, it was necessary to provide testimony from each of the prior servicers for the Olsons' loan in order

---

[15] The Olsons also cite to our unpublished decision in *Bank of America N.A. v. Minkov*, No. 2012AP2643, unpublished slip op. (WI App Aug. 8, 2013). In *Minkov*, we reversed a trial court's grant of summary judgment in favor of Bank of America, finding that the affidavit submitted in support of Bank of America's summary judgment motion was not sufficient to create a *prima facie* case for summary judgment. *Id.*, ¶ 1. We reached that conclusion in part based on the affiant's failure to establish that she was qualified to testify as to loan payment statements prior to the time that Bank of America took over the loan. *See i d.*, ¶¶ 32–36. *Minkov*, which is not binding, *see* Wis. Stat. § 809.23(3)(a), is distinguishable, as it was based on an affidavit submitted in support of summary judgment and did not have the benefit of extensive witness testimony at trial, as did the trial court here. *See Minkov*, No. 2012AP2643, unpublished slip op., ¶ 1. Moreover, it is not clear whether the *Minkov* affiant averred to any process or procedure for integrating a prior servicer's loan statements as Johnstone provided in this case.

to establish default and the amount due and owing despite Johnstone's extensive and detailed testimony on direct and cross-examination that SPS integrated Bank of America's records in the process of creating SPS's own records and that SPS relied on Bank of America's records during that process. We agree with the trial court's recognition that Johnstone's testimony, particularly in regard to the integration of and reliance upon the prior servicer's records, bolsters the reliability of the documents at issue. Moreover, Johnstone's extensive and in-depth testimony readily distinguishes this case, particularly as to those cases where an affidavit was rejected on summary judgment without further testimony from the affiant.

¶ 44. We appreciate the Olsons' argument that as an employee of SPS, Johnstone did not have personal knowledge as to how Bank of America, the previous servicer for the Olsons' loan, created and maintained *its* records. As we have explained, however, Johnstone was testifying as to the records that SPS—not Bank of America—created and maintained in the course of its business, and in particular, in the course of servicing the Olsons' loan. It is true that SPS's records incorporate Bank of America's records; however, as we discussed herein, third-party records can fall within the business records exception where the third-party's records are relied upon and integrated into the latter party's business records, and Johnstone provided ample testimony that such is the case here.

██

¶ 45. As we noted in *Palisades*, "a custodian or other qualified witness does not need to be the author of the records or have personal knowledge of the events recorded." *See id.*, 324 Wis. 2d 180, ¶ 22. Rather, the custodian or qualified witness need only have "per-

sonal knowledge of how the records were made so that the witness is qualified to testify that they were made 'at or near the time [of the event] by, or from information transmitted by, a person with knowledge' and 'in the course of regularly conducted activity.' " *See id.* (citation omitted; brackets in *Palisades*). Johnstone's testimony established that she had personal knowledge of how Exhibits 6 and 7 were created, that the records were created as part of SPS's regularly conducted activity, and that the records were created from information transmitted by Bank of America at the time of the servicing transfer.

¶ 46. Thus, the distinction here is that the records that Johnstone testified to were actually records that *SPS created,* and her testimony established that those records were of the type regularly created in the course of SPS's business. While it is true that the data that SPS relied upon in creating those records came from a prior servicer, SPS integrated Bank of America's records into its own records, and Johnstone testified extensively as to that process and as to how SPS creates its own records in the course of its regularly conducted activity. Contrary to the Olsons' argument, this simply is not a scenario in which a custodian from one entity testified to records created by another entity.[16]

¶ 47. We conclude that Johnstone was qualified to testify as to the records at issue, and the trial court therefore properly admitted Exhibits 6 and 7 under the business records exception. We believe that our con-

---

[16] We caution, however, that presenting admissible testimony or affidavits from all prior records custodians, as occurred in *Yang*, remains the most prudent approach, particularly where there is a likelihood that a party will challenge the admissibility of evidence such as in the case before us now.

struction of the business records exception in this case recognizes that our evidentiary rules "shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." Wis. Stat. § 901.02. Having concluded that the trial court properly admitted Exhibits 6 and 7, we do not address Deutsche Bank's alternate arguments concerning the admissibility of those documents under Wis. Stat. § 908.03(24) and whether the trial court properly refused to admit the Bank of America certification under Wis. Stat. § 909.02(12).[17]

*By the Court.*—Judgment affirmed.

[17] At trial, Deutsche Bank marked a certified payment history from Bank of America, N.A. as Exhibit 5 and sought to admit it pursuant to Wis. Stat. § 909.02(12), "Certified Domestic Records of Regularly Conducted Activity." The Olsons objected, and the court denied Deutsche Bank's request to admit the certified payment history because it "want[ed] somebody who's a custodian to testify to this so that the other side can cross-examine." After discussion, the court also concluded that it would not admit the certified payment history into evidence after concluding that Deutsche Bank had failed to give the proper notice required by § 909.02(12).